# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Great Lakes Gas Transmission Limited Partnership, | Civil No. 09-CV-3037 (SRN/LIB) |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| v. | |
| Essar Steel Minnesota, LLC; Essar Steel Holdings, Ltd.; Essar Steel Limited; and Essar Global Limited, a/k/a Essar Group, | |
| Defendants. | |

-----------------------------------------------------

| |
|---|
| Essar Steel Minnesota, LLC, |
| Counterclaimant, |
| v. |
| Great Lakes Gas Transmission Limited Partnership, |
| Counterclaim Defendant. |

Barbara L. Wohlrabe, Susan D. Nassar, and David W. Elrod, Elrod PLLC, 500 North Akard Suite 3000 Dallas, Texas 75201; David T. Schultz and Julian C. Zebot, Maslon, Edelman, Borman & Brand, LLP, 90 South Seventh Street Suite 3300, Minneapolis, Minnesota, 55402, for Plaintiff and Counterclaim Defendant

Stephanie J. Goldstein, Fried, Frank, Harris, Shriver & Jacobson, LLP, One New York Plaza, New York, New York 10004; Thomas S. Fraser and Nicole Moen, Fredrikson & Byron, PA, 200 South Sixth Street, Suite 4000, Minneapolis, Minnesota 55402, for Defendants and Counterclaimants

SUSAN RICHARD NELSON, United States District Court Judge

This matter is before the Court on Plaintiff's Motion to Dismiss for Failure to State a

Claim and to Strike Defendant's Pleading  [Doc. No. 364].  For the reasons that follow, Plaintiff's motion is granted.

## I.    BACKGROUND

In October 2009, Plaintiff Great Lakes Gas Transmission Limited Partnership ("Great Lakes") filed a breach of contract action against Defendant Essar Steel Minnesota, LLC ("ESML"), and its affiliated entities, Essar Steel Holdings, Ltd., Essar Steel Limited, and Essar Global Limited, a/k/a Essar Group (collectively, the "Essar Entities").  ESML subsequently filed a counterclaim against Great Lakes and filed third-party claims against nine entities related to Great Lakes: TC GL Intermediate Limited Partnership, TC Pipelines, LP, TC Pipelines GP, Inc., TransCan Northern, Ltd., TransCanada Pipeline USA, Ltd., TransCanada Pipelines Ltd., TransCanada Corporation, Great Lakes Gas Transmission Co., and TransCanada GL, Inc. (the "TransCanada Entities").[1]  Pursuant to a stipulation of the parties, on March 1, 2012, the Court dismissed the third-party claims against the nine TransCanada Entities. (Order of 3/1/12 [Doc. No. 396].)  Accordingly, portions of Plaintiff's instant motion regarding the TransCanada Entities are now moot.  The Court therefore confines its discussion to arguments related to Great Lakes and ESML.

In its Amended Complaint, Great Lakes alleges that it owns and operates a natural gas pipeline, which transports over 2.2 billion cubic feet of natural gas per day through 2,100 miles of pipeline.  (Am. Complaint ¶ 12 [Doc. No. 35].)  The pipeline extends from the Minnesota-Manitoba border at Emerson, Manitoba, to the Michigan-Ontario border at St. Clair, Ontario, and

---

[1]    While the Essar Defendants filed a joint answer to the Amended Complaint, the Counterclaim is asserted solely by Defendant ESML. (Counterclaim [Doc. No. 80].)

"serves as a link between western Canada's natural gas basin and major industrial and market centers in Minnesota, Wisconsin, Michigan, and eastern Canada." (Id.)  Great Lakes alleges that it offers the use of its pipeline to shippers of natural gas for a rate that is regulated by the Federal Energy Regulatory Commission ("FERC"). (Id. ¶ 13.)

Defendant ESML is a Minnesota company affiliated with the other Essar entities, which are engaged in manufacturing and the provision of services in various industries, including the steel industry.  (Am. Compl. ¶ 15 [Doc. No. 35].)  In 2007, Essar Steel Holdings, the sole member of ESML, acquired the membership units of a company known as Minnesota Steel Industries ("MSI"), which was renamed Essar Steel Minnesota, LLC.  (Counterclaim ¶ 3-4 [Doc. No. 80].) The Essar Entities purchased MSI for the purpose of constructing a steel plant in Nashwauk, Minnesota.  (Id.)  As alleged in ESML's Counterclaim, for several years, MSI had been developing plans to construct a fully-integrated steel making facility, which, when operational, would require natural gas as an energy source.  (Id. ¶ 20.)

The parties' claims in this action arise from a September 6, 2006 contract between Great Lakes and MSI (the "Contract").  (Am. Compl. ¶ 17 [Doc. No. 35]; Contract, Ex. 1 to Aff. of Barbara Wohlrabe [Doc. No. 347-1].)  There appears to be no dispute that ESML acquired the membership interests of MSI, and that the terms of the Contract are binding on ESML.  Under the general terms of the Contract, which is also referred to by the parties as the Transportation Services Agreement, or "TSA," Great Lakes agreed to transport up to 55,000 dekatherms of natural gas per day on MSI's behalf, from its Emerson receipt point to its Carlton delivery point, or to "a new location near Mile Post 228."  (Contract, App. A, Ex. 1 to Wohlrabe Aff. [Doc. No. 347-1].)  Defendant ESML alleges that the "new location" is a yet-to-be constructed delivery

point on the Great Lakes pipe system, which would connect Great Lakes' pipeline with a yet-to-be constructed pipeline to transport gas to the steel facility in Nashwauk. (Counterclaim ¶ 3 [Doc. No. 80].)    The Contract term began running on July 1, 2009 and continues through March 31, 2024. (Contract, Ex. 1 to Aff. of Barbara Wohlrabe [Doc. No. 347-1].)  ESML alleges that the parties intended for performance of the Contract to coincide with the commencement of operations at the contemplated new steel facility in Nashwauk, Minnesota.  (Counterclaim ¶ 28 [Doc. No. 80].)

As consideration for the transportation services, Plaintiff alleges that MSI agreed to pay the rates indicated in the Contract, which included the rate schedule reflected in Great Lakes' FERC Gas Tariff (the "Tariff"). (Am. Compl. ¶ 17 [Doc. No. 35].)    However, ESML contends that during contract negotiations, Great Lakes misrepresented the cost of its service to transport gas.  (Counterclaim ¶ 25 [Doc. No. 80].)  ESML further contends that Great Lakes has misrepresented its costs to other customers, leading FERC to commence regulatory proceedings against Great Lakes.  (Id. ¶ 26.)   Plaintiff alleges that under the Contract, the reservation fee for the agreed-upon transportation was to be paid monthly.  (Am. Compl. ¶ 20 [Doc. No. 35].)  Great Lakes contends that Defendants failed to make the first payment of $190,190, due on August 17, 2009, and have consistently failed and refused to make payments.  (Id.)

The Contract incorporates the rates found in the Tariff, as well as the general terms and conditions set forth in the Tariff.  (Contract ¶ 12, Ex. 1 to Wohlrabe Aff. [Doc. No. 347-1].)  One such general term or condition is the Tariff's *force majeure* clause.  The clause enumerates various types of circumstances excusing the parties' liability to each other in damages.  Among other things, the clause enumerates acts of God, strikes, natural disasters and labor strikes and

4

further provides that liability may be excused for:

> any other cause, whether the kind herein enumerated or otherwise, and whether caused or occasioned by or happening on account of the act or omission of one of the parties hereto or some person or concern not a party hereto, not within the control of the party claiming suspension and which by the exercise of due diligence such a party is unable to prevent or overcome.

(Tariff ¶ 10.1, Ex. B to Counterclaim [Doc. No. 80-2 at 48].) (emphasis added).

Immediately following the *force majeure* clause, the remedy section of the Tariff provides that such circumstances or contingencies affecting the parties' respective performance do not relieve it from liability "in the event of concurring negligence," nor do such circumstances relieve it "from its obligation to make payments of amounts then due thereunder. . . ."   (Tariff ¶ 10.2, Ex. B to Counterclaim [Doc. No. 80-2 at 48].)

Pursuant to the Contract, MSI obtained a letter of credit ("Letter of Credit") in the amount of $580,000, for which Great Lakes is the beneficiary, MSI is the borrower and American Bank of the North is the lender.  (Counterclaim ¶ 37 [Doc. No. 80]; Letter of Credit, Ex. C to Counterclaim [Doc. No. 80-3].)  Under the terms of the Letter of Credit, if MSI fails to make payment consistent with the Contract, Great Lakes may draw upon the Letter of Credit for reimbursement.  (Letter of Credit, Ex. C to Counterclaim [Doc. No. 80-3].)

ESML contends that while it intended to secure funding for construction of the steel facility in Nashwauk, the intervening 2008 global financial crisis made it difficult to do so. (Counterclaim ¶¶ 39-58 [Doc. No. 80].)  Specifically, ESML alleges that global demand for steel plummeted in 2008 and 2009, forcing steel prices to a six-year low.  (Id. ¶¶ 49-51.)  ESML contends that the "credit freeze, the world-wide economic problems, and the depression of steel prices have inhibited ESML from obtaining financing for the [Nashwauk] Facility."  (Id. ¶ 55.)

Consequently, ESML alleges that until it secures financing, it cannot commence construction of the steel plant in Nashwauk.  (Id. ¶ 56.)  Alleging that its inability to secure financing was outside its control, and that it could not otherwise obtain financing, ESML has invoked the *force majeure* clause of the Tariff, alleging that "the slump in steel prices constitutes an event that permits ESML to delay its performance . . . ."  (Id. ¶ 58.)

In the first count of its three-count Counterclaim, ESML seeks a declaratory judgment that its duty to perform pursuant to the Contract is excused in light of its inability to obtain financing for the Nashwauk facility.  (Id., Count I.)  In the alternative, in its second count, ESML seeks a declaratory judgment that its performance is excused under the doctrine of temporary commercial impracticability/impossibility.  (Id., Count II.)

ESML contends that Great Lakes rebuffed its efforts to resolve the contractual dispute and instead, on November 20, 2009, drew upon the Letter of Credit.  (Id. ¶ 69.)  This action forms the basis for ESML's count of conversion in its Counterclaim.  (Id., Count III.)  In this count, ESML alleges that Great Lakes had no basis for drawing upon the Letter of Credit, as ESML's non-performance under the Contract was excused by the *force majeure* clause.  (Id.)

ESML pled three additional counts in its Counterclaim in which it sought to establish derivative liability against former Third-Party Defendants, the TransCanada entities, based on theories of piercing the corporate veil, alter ego/mere instrumentality, joint enterprise/joint venture and agency liability.  (Id., Counts IV-VI.)  Because Defendants voluntarily dismissed the TransCanada entities from the case, these derivative counterclaims against the TransCanada entities are now moot and are therefore dismissed.   Plaintiff answered the Counterclaim [Pl's Reply to ESML's Counterclaim, Doc. No. 91], and now moves to dismiss pursuant to Fed. R. Civ.

P. 12(b)(6).  In addition, Plaintiff moves to strike Counts I and II of the Counterclaim, pursuant to

Fed. R. Civ. P. 12(f).

In moving to strike Counts I and II of ESML's Counterclaim, Plaintiff argues that these

counts for declarative relief are redundant and repetitious of ESML's affirmative defenses.  In

support of its Motion to Dismiss, Great Lakes contends that the Contract requiring ESML to make

monthly payments to Great Lakes is separate and independent from ESML's plans to construct a

steel facility in Nashwauk, Minnesota.  The Contract, Great Lakes asserts, is unambiguous and is

clear that ESML's obligations are not contingent upon constructing the steel facility or obtaining

financing.  (See Pl's Mem. Supp. Mot. Dismiss at 2 [Doc. No. 364].)  Rather, Plaintiff argues, the

Contract simply requires Great Lakes to transport natural gas, and for ESML to take the gas and

pay for it.  Great Lakes asserts that, regardless of whether ESML intends to use the gas or operate

the steel facility, it is ESML's obligation to have a lateral pipeline constructed.  Accordingly,

Plaintiff argues that ESML's decision to delay construction of the steel facility and the lateral

pipeline and its alleged inability to obtain financing are not excused by virtue of the *force

majeure* clause or by the doctrines of impracticability/impossibility.  (Id. at 3.)

In response, ESML argues that Plaintiff brings this motion under the incorrect procedural

rule – Rule 12(b)(6) as opposed to Rule 12(c) – and the Court should therefore deny the motion as

procedurally improper.[2]  (ESML's Opp'n Mem. at 19 [Doc. No. 374].)  On the merits, ESML

---

[2]  Because Third-Party Defendants were in the case at the time that ESML filed its response memorandum, ESML also argued that consideration under Rule 12(c) of Plaintiff's and Third-Party Defendants' Motions to Dismiss was also improper.  Because Rule 12(c) motions may only be brought when the pleadings have closed, and because Third-Party Defendants had not answered the Third-Party Complaint, ESML argued that the motions to dismiss should be denied as premature.  Because Third-Party Defendants have since been dismissed from the case and because Plaintiff has filed its Answer to ESML's Counterclaim, the Rule 12(c) requirement

contends that the broad language of the Contract's *force majeure* clause excuses its non-performance under the Contract and that it has stated a plausible claim for a declaratory judgment to that effect.  (Id. at 22-27.)  Likewise, ESML argues that it has pled a plausible claim for relief as to its alternative count for a declaratory judgment based on the doctrines of impossibility/impracticability.  (Id. at 27-32.)  Specifically, ESML contends that its performance should be excused in light of the unforeseeable worldwide financial crisis and its effect on ESML's ability to obtain financing.  (Id.)  Finally, ESML contends that it has presented a plausible claim that Great Lakes wrongfully converted the Letter of Credit funds that ESML posted as security.  (Id. at 32-33.)

## II.     DISCUSSION

### A.     Standard of Review

Plaintiff purports to bring a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  ESML argues, however, that Great Lakes filed this motion after filing its answer to ESML's counterclaims and therefore, Plaintiff's motion is procedurally improper.[3]  (See Pl's Reply to ESML's Counterclaims [Doc. No. 91].)  Although the TransCanada Entities are no longer in this case, they were represented by the same counsel as Great Lakes, and, on the same

of closed pleadings is met, and ESML's argument with respect to Rule 12(c) is moot.

[3]  On July 2, 2010, Plaintiff filed its Reply to ESML's Counterclaim [Doc. No. 91] and also filed a motion to dismiss pursuant to Rule 12(b)(6) [Doc. No. 93].  In October 2010, the Court stayed the parties' Rule 12 motions while the parties conducted jurisdictional discovery [Doc. 190], and in January 2011, the Court ordered the parties to withdraw the pending Rule 12 motions without prejudice [Doc. No. 265].  In March 2011, pursuant to the Amended Pretrial Scheduling Order [Doc. No. 272], the Court ordered the parties to file all dispositive motions by September 1, 2011.  On September 1, 2011, Plaintiff filed the instant motion in accordance with the scheduling order.

day that Plaintiff's instant motion was filed, the TransCanada Entities filed a motion to dismiss pursuant to Rule 12(c).  Although that motion is no longer before the Court, ESML had argued that the TransCanada Entities' motion should have been styled as a Rule 12(b)(6) motion, since the TransCanada Entities had not yet filed their answer.

By its terms, Rule 12(b) provides that a party asserting a defense by motion, including a motion for failure to state a claim upon which relief can be granted, must assert such a defense before pleading, if a responsive pleading is allowed.  Fed. R. Civ. P. 12(b) (emphasis added).  Technically, therefore, a Rule 12(b)(6) motion cannot be filed after an answer has been submitted.  Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir.1990).

> As a leading treatise observes, "A strict interpretation of [this] language leads to the conclusion that the district judge must deny any Rule 12(b) motion made after a responsive pleading is interposed as being too late." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1361 (3d ed. 2004). But as that treatise also observes, as long as the defense of failure to state a claim has been asserted in the answer, federal courts routinely consider defendants' post-answer motions raising the defense "although technically they are no longer Rule 12(b) motions." Id.

Ali v. Frazier, 575 F. Supp.2d 1084, 1089 (D. Minn. 2008).

In Ali, this Court treated the moving party's Rule 12(b)(6) motion to dismiss for failure to state a claim as a Rule 12(c) motion asserting the same argument.  Id. at 1089-90 (citing Westcott, 901 F.2d at 1488.   A motion for judgment on the pleadings brought pursuant to Rule 12(c) may be brought "after the pleadings are closed - but early enough not to delay trial. . . ." Fed. R. Civ. P. 12(c).  "As the Eighth Circuit held in Westcott, because motions to dismiss for failure to state a claim are subject to the same legal standard whether brought under Rule 12(b)(6) or Rule 12(c), the distinction is "purely formal . . . ." Ali, 575 F. Supp.2d at 1089 (citing Westcott, 901 F.2d at 1488.)

While ESML argues that Great Lakes did not assert a Rule 12(b)(6) defense in its Reply to ESML's Counterclaim, Great Lakes did invoke Rule 12 in its Answer, albeit the provisions of Rule 12 pertaining to a motion for a definite statement and a motion to strike.  (Pl's Answer at 2 [Doc. No. 91].)   Given the procedural history of this case, the refusal to consider Plaintiff's motion because it was styled as a Rule 12(b)(6) motion rather than a Rule 12(c) motion would be unfair.  An examination of the docket reveals that Plaintiff filed its original Motion to Dismiss (i.e., the predecessor to the instant motion) on the same day that it filed its Reply to ESML's Counterclaim.  (See Doc. Nos. 91 & 93.)   Assuming for the sake of argument that Great Lakes had simply filed these documents in reverse order, i.e., the Motion to Dismiss first, as Docket No. 91, and Plaintiff's Answer second, as Docket No. 93, there would be no procedural infirmity.

In light of all of these factors – the specific procedural circumstances of this case, the identical standard of review applicable under the two rules, and the Eighth Circuit's recognition of a "purely formal" distinction between the rules – the Court will consider Plaintiff's motion under Rule 12(c), on the merits.  This approach is consistent with rulings made, albeit in passing, by this Court, see E.E.O.C. v. Northwest Airlines, 216 F. Supp.2d 935, 937 (D. Minn. 2002), and by other district courts within the Eighth Circuit, see, e.g., Egziabher v. Parks, No. 11-CV-5088, 2012 WL 912933, *1-2 (W.D. Ark. Mar. 16, 2012); Janis v. Nelson, No. 09-CR-5019-KES, 2009 WL 5216902, *2, n.2 (D. S.D. Dec. 30, 2009); Woods v. St. Louis Justice Center, No. 4:06-CV-233 CAVES, 2006 WL 2990240, *1 (E.D. Mo. Oct. 18, 2006).

When evaluating a motion to dismiss, the Court assumes as true the factual allegations in the complaint (or counterclaim) and construes all reasonable inferences from those facts in the light most favorable to the non-moving party.  Schaaf v. Residential Funding Corp., 517 F.3d

10

544, 549 (8th Cir. 2008).  However, the Court need not accept as true wholly conclusory

allegations, Hanten v. Sch. Dist. of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999), or

legal conclusions that the pleader draws from the facts pled.  Westcott v. City of Omaha, 901 F.2d

1486, 1488 (8th Cir. 1990).

        To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to

relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007).

Although a complaint need not contain "detailed factual allegations," it must contain facts with

enough specificity "to raise a right to relief above the speculative level."  Id. at 555.  As the

United States Supreme Court recently reiterated, "[t]hreadbare recitals of the elements of a cause

of action, supported by mere conclusory statements," will not pass muster under Twombly.

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 550 U.S. at 555).  In sum, this

standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal

evidence of [the claim]."  Twombly, 550 U.S. at 556.

        When considering a motion for judgment on the pleadings (or a motion to dismiss under

Fed. R. Civ. P. 12(b)(6)), the court generally must ignore materials outside the pleadings, but it

may consider 'some materials that are part of the public record or do not contradict the

complaint,' Missouri ex rel. Nixon v. Coeur D'Alene Tribe, 164 F.3d 1102, 1107 (8th Cir. 1999),

cert. denied, 527 U.S. 1039 (1999), as well as materials that are "necessarily embraced by the

pleadings."  Piper Jaffray Cos. v. National Union Fire Ins. Co., 967 F. Supp. 1148, 1152 (D.

Minn. 1997).  See also 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure: Civil 2d § 1357, at 199 (1990) (court may consider 'matters of public record, orders,

items appearing in the record of the case, and exhibits attached to the complaint').  The Court

here considers the Contract, Tariff and the Letter of Credit as materials necessarily embraced by the pleadings. The terms of these documents are referenced in ESML's Counterclaim, to which all three documents are attached as exhibits (Contract and Tariff, Ex. B to Counterclaim [Doc. No. 80-2]; Letter of Credit, Ex. C to Counterclaim [Doc. No. 803]), and in the Amended Complaint. Any other substantive affidavits and declarations of the parties will not be considered.

**B.      ESML's Claim for a Declaratory Judgment Based on the _Force Majeure_ Clause**

As noted, the Contract incorporates the general terms and conditions set forth in the Tariff. (Contract ¶ 12, Ex. 1 to Wohlrabe Aff. [Doc. No. 347-1].) One such "general term or condition" is the Tariff's _force majeure_ clause, which provides, in full:

> Neither Shipper nor Transporter shall be liable in damages to the other for any act, omission or circumstances occasioned by or in consequence of: any acts of God, strikes, lockouts, acts of the public enemy, wars, blockages, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, storms, floods, washouts, arrests and restraints of rulers and peoples, civil disturbances, explosions, breakage or accident to machinery or lines of pipe, line freezeups, decline in the Btu level of Gas received by Transporter at any point below the level at which the MDQs of Service Agreements are based, as specifically stated in Section 8.1 of the General Terms and Conditions, to the effect that Transporter can not Transport Shippers Scheduled Daily Delivery, or the binding order of any court or governmental authority which has been resisted in good faith by all reasonable legal means, and <u>any other cause, whether the kind herein enumerated or otherwise, and whether caused or occasioned by or happening on account of the act or omission of one of the parties hereto or some person or concern not a party hereto, not within the control of the party claiming suspension and which by the exercise of due diligence such a party is unable to prevent or overcome.</u>

(Tariff ¶ 10.1, Ex. B to Counterclaim [Doc. No. 80-2 at 48].) (emphasis added). ESML argues that it has stated a plausible claim for a declaratory judgment and that the underscored language above, in the _force majeure_ clause, excuses its non-performance under the Contract. Specifically,

ESML contends that it was unable, "through no fault of its own, to obtain financing for the Nashwauk facility due to the unprecedented credit freeze, economic meltdown and dive in steel demand resulting from the Great Recession."  (Counterclaim, Count I [Doc. No. 80].)

As an initial matter, the Contract provides that any disputes arising under the agreement shall be determined in accordance with Michigan law.  (Contract ¶ 13, Ex. 1 to Aff. of Barbara Wohlrabe [Doc. No. 347-1].)   Under Michigan law, while the main goal of contract interpretation is to enforce the parties' intent, "when the language of a document is clear and unambiguous, interpretation is limited to the actual words used, and parol evidence is inadmissible to prove a different intent." Burkhardt v. Bailey, 680 N.W.2d 453, 464 (Mich. App. 2004).[4]

Michigan courts have recognized that a *force majeure* clause relieves a party from termination of the agreement "due to circumstances beyond its control that would make performance untenable or impossible."   Erickson v. Dart Oil, 474 N.W.2d 150, 156 (1992) (citing Edington v. Creek Oil Co, 690 P.2d 970, 973 (Mont. 1984)).  However, a *force majeure* clause may not be invoked to excuse performance where the delaying condition was caused by the party invoking it or could have been prevented by the exercise of prudence, diligence, and care.  Id. at 155.   A party's "failure to explore or utilize available options to overcome the delaying condition can constitute lack of due diligence." Id. (citing Woods v. Ratliff, 407 So.2d 1375, 1378-1379 (La. App. 1981)).   The Michigan Court of Appeals has also observed that "*force majeure*" is a term that is "virtually unknown" in Michigan common law, prompting

---

[4]   ESML argues that "reliance" on Burkhardt v. Bailey is inapposite because that decision addressed contract interpretation in an assignment clause.  In addition, ESML argues that it does not ask this Court to re-write the Contract.  (ESML's Opp'n Mem. at 23, n.12.)  The Court cites Burkhardt for the general proposition that clear and unambiguous contractual language is interpreted in accordance with the written terms of the contract.

Michigan courts to turn to other jurisdictions for guidance in cases in which such clauses are invoked.  Cordoba v. City of Detroit, No. 221391,  2001 WL 1009308, *3 (Mich. Ct. App. 2001) (Mich. Ct. App. 2001) (citing Erickson, 474 N.W.2d at 150).  Accordingly, where Michigan law is undeveloped or silent, the Court will consider persuasive authority from other jurisdictions.

At least one Michigan decision has addressed the 2008 financial crisis in the context of a force majeure clause.  In Flathead-Michigan I, LLC v. Peninsula Devl., LLC, No. 09-14042, 2011 WL 940048, *4 (E.D. Mich. 2011), defendants argued that the economic downturn of 2008 prevented them from complying with the terms of their loans and guarantees.  Based on this argument, the defendants sought leave to amend their pleadings to add affirmative defenses that included commercial impracticability, impossibility and invocation of force majeure.  While most of the opinion addressed the doctrines of impracticability and impossibility, the United States District Court for the Eastern District of Michigan also rejected the defendants' force majeure argument, without elaboration, finding, "[t]he defense of force majeure, inapplicable to financial hardships, is also unavailable."[5]  Id. at *5 (emphasis added).

Courts in other jurisdictions have considered whether the 2008 financial crisis constitutes a force majeure, with mixed results.  See, e.g., In re Old Carco LLC, 452 B.R. 100, 119 (S.D.N.Y. 2011) (invoking force majeure clause was proper); but see, Elavon, Inc. v. Wachovia Bank, et al., __ F. Supp.2d __, No. 1:09-CV-139-ODE, 2011 WL 7071066, *8 (N.D. Ga. May 23, 2011) (finding that no external force majeure prevented the defendant from continuing to perform under the agreement in question); Route 6 Outparcels, LLC v. Ruby Tuesday, Inc., No. 2413-09, 2010 WL 1945738, *3-4 (N.Y. Sup. Ct. May 12, 2010) (finding that the defendant failed to

---

[5]  The court also noted that the loan agreements did not contain a force majeure clause. 2011 WL 940048 at *5, n.1.

demonstrate that it was prevented from complying with its contractual obligations due to events entirely outside of its control).

The bankruptcy court in <u>Old Carco</u>, which found that the *force majeure* clause was properly invoked, first noted that financial difficulties do not generally excuse a defaulting party's performance.  452 B.R at 119.  However, the court found it significant that the *force majeure* clause at issue specifically included "change to economic conditions" as an enumerated event that could excuse a default:

> The requirement that the event must be expressly identified in the *force majeure* clause in order to excuse performance is "especially true where the event relied upon to avoid performance is a market fluctuation."  <u>United States v. Panhandle E. Corp.</u>, 693 F. Supp. 88, 96 (D. Del. 1988). Therefore, while courts will not presume that a change in economic conditions constitutes an excuse for nonperformance, this does not preclude the parties from negotiating for such an excuse.

<u>Id.</u> at 119-20.

The court then went on to consider whether the event in question – a plant closing – was caused by both a change in economic conditions, and was outside of Old Carco's control.   <u>Id.</u> at 119-25.  The court found in the affirmative as to both points, and further found that Old Carco had "exerted reasonable efforts to remain a viable business, perform its obligations, and retain the plant."  <u>Id.</u> at 125.

Faced with essentially the opposite facts, the court in <u>Route 6</u>, 2010 WL 1945738 at *3-4, reached a different conclusion in a case involving the alleged breach of a commercial lease agreement for a Ruby Tuesday restaurant.  The operative *force majeure* clause excused performance based on events beyond the parties' control, including, "without limitation, all labor disputes, governmental regulations or controls, fire or other casualty, inability to obtain any

15

material, services, acts of God, or any other cause, whether similar or dissimilar to the foregoing, not within the control [of the parties]." Id. at *2.   A change in financial circumstances was not included among the enumerated list of triggering events, unlike Old Carco.

The court found that while the "worldwide economic meltdown" was an event beyond Ruby Tuesday's control, the critical inquiry was whether Ruby Tuesday was actually prevented from constructing a restaurant due to events entirely outside its control and through no fault of its own. Id. at *4.  Construing the plain language of the *force majeure* clause, the court observed that courts are generally reluctant to excuse contractual non-performance based on claims of economic hardship and changing economic circumstances.

While noting that "it is a well established rule of contract law that *force majeure* clauses must be narrowly construed," the court held that

> even assuming for purposes of this motion that a severe economic downturn is a triggering event that falls within the broad "catchall" language of the *force majeure* clause, the Court concludes that Ruby Tuesday has failed to demonstrate that it was prevented from complying with its obligations under the Lease due to events entirely outside of its control.

Id. at *4.  Rather, the court found that "all defendant has shown is that changing economic conditions have made it burdensome or more difficult to perform its contractual obligations." Id. at *5.  In particular, the court noted that Ruby Tuesday failed to identify the steps it took to perform its obligations under the lease, despite its financial difficulties.  Id.

In Elavon, __ F. Supp.2d __, 2011 WL 7071066 at *8, the court rejected the defendants' argument that the 2008 economic crisis constituted a *force majeure* which excused the defendants' obligations under the contract in question.  Like the Route 6 case, the *force majeure* clause in Elavon did not include "financial crises" in the enumerated instances of *force majeure*.

2011 WL 7071066 at *6.  However, the agreement stated that the enumerated instances of *force majeure* were not exclusive but instead "without limitation as to other events beyond the control of the part[ies]."  Id.  Nonetheless, the court found that co-defendant Wells Fargo Bank chose to sign a contract when it knew that a merger with Wachovia was pending and knew of Wachovia's contract with Elavon.  Id. at *6.  Even if the financial market could be considered a *force majeure*, the court again noted that the contract's *force majeure* clause did not include financial crises in the list of enumerated events.  Id.  Ultimately, regardless of whether the financial crisis of 2008 constituted a *force majeure*,  the court concluded that no external *force majeure* prevented Wachovia from continuing to perform under the agreement in question.  Id

In Seitz v. Mark-O-Lite Sign Contractors, Inc., 510 A.2d 319, 321 (N.J. Super. Ct. Law Div. 1986), a *force majeure* decision that did not involve the 2008 financial crisis, the court considered whether a broad, or "catch-all," *force majeure* clause could be construed to apply to circumstances or events different from those otherwise specifically enumerated in the clause.  The allegedly breaching party sought to invoke the *force majeure* clause due to the physical disability of a key worker.  Id.  The *force majeure* clause provided:

> The Company shall not be liable for any failure in the performance of its obligations under this agreement which may result from strikes or acts of labor union [sic], fires, floods, earthquakes, or acts of God, War or other conditions or contingencies beyond its control.

Id.  In construing the clause, the court relied on the rule of *ejusdem generis*, and narrowly interpreted the catch-all language of the clause such that "only events or things of the same general nature or class as those specifically enumerated" fell within the clause to excuse a party's non-performance.  Id.  The court specifically found that the employee's disability did not fall into the same class as that of labor strikes, fires, floods, earthquakes, war or acts of God.  Id.  Rather,

it was a progressive aggravation of an underlying health problem.  Id.

In this case, while the *force majeure* clause includes a laundry list of hardships that may suspend a party's obligations under the Contract, it does not include financial crises or changes in financial conditions.  Moreover, the remedies section, immediately following the *force majeure* clause, provides:

> Such causes or contingencies affecting the performance of the Agreement by either party, however, shall not relieve it of liability in the event of its concurring negligence or in the event of its failure to use due diligence to remedy the situation and remove the cause in an adequate manner and with all reasonable dispatch, nor shall such causes or contingencies affecting the performance of this Agreement relieve either party from its obligation to make payments of amounts then due thereunder. . . .

(Tariff ¶ 10.2, Ex. B to Counterclaim [Doc. No. 80-2 at 48]) (emphasis added).  Reading the contract as a whole, it would make little sense for the *force majeure* clause to excuse ESML's obligation to make payments when the immediately succeeding remedies clause explicitly provides that neither party is excused from its obligation to make payments of amounts due under the Contract.

However, what is most determinative is the plain language of the Contract.  The Contract is for the transportation of natural gas.  Great Lakes' obligation under the contract is to provide the transportation, and ESML's obligation is to pay a fee for that service.  The parties' obligations are not conditioned on ESML's ability to obtain financing, the status of the Nashwauk facility, or the status of the construction of any lateral pipelines necessary to transport natural gas to that facility.  ESML's claim that the parties intended for the Contract to commence with the simultaneous commencement of operations at the Nashwauk facility (Counterclaim ¶ 28 [Doc. No. 80]) is belied by the face of the Contract, which provides for a term from July 1, 2009 to

18

March 31, 2024.  Similarly, while ESML contends that the City of Nashwauk was responsible for building a lateral connecting pipeline, and failed to do so (id. ¶ 31), again, the Contract, between ESML's predecessor and Great Lakes contains no such provisions or conditions.

The fact that ESML might not be able to obtain financing for the construction of the steel facility, even absent a global financial crisis, was a foreseeable event.  Had MSI/ESML wanted to avoid its obligations under the Contract due to this possibility, it could have included a provision in the Contract conditioning its performance on the events which, ESML now contends, make its performance impossible or impracticable.  ESML fails to connect its invocation of the *force majeure* clause directly with the terms of the Contract.   It focuses on the financing needed for construction of the Nashwauk steel facility, but the Contract simply and plainly obligates ESML to make its monthly payments.

Finally, accepting ESML's factual allegations as true, which this Court must under the Rule 12 standard, ESML fails to sufficiently allege facts demonstrating that it made reasonable efforts to sell its pipeline capacity on the secondary market, or took sufficient, specific measures in mitigation.  For all of these reasons, the Court finds that ESML has failed to state a plausible claim for a declaratory judgment that, based on the *force majeure* clause, its duty to perform pursuant to the Contract is excused, without consequence, until the Nashwauk facility is in a position to require the delivery of natural gas.

C.      **ESML's Claim for a Declaratory Judgment Based on Temporary Commercial Impracticability/Impossibility**

The Court's analysis of ESML's alternative count based on the doctrines of commercial impracticability and impossibility is similar to its analysis regarding the *force majeure* clause. See Flathead-Michigan, 2011 WL 940048 at *4 (describing commercial impracticability, impossibility and *force majeure* as "overlapping defenses"); Steel Indus., Inc. v. Interlink Metals & Chems., Inc., 969 F. Supp. 1046, 1052, n.17 (E.D. Mich. 1997) (simultaneously relying on cases involving the doctrines of contract construction, *force majeure* and impracticability and finding them to dictate the same result).

In cases involving the defense of impracticability, courts applying Michigan law have cited to the Restatement Second of Contracts § 261 (1981), which provides that if "after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the nonoccurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate to the contrary." Karl Wendt Farm Equipment Co., Inc. v. Int'l Harvester Co., 931 F.2d 1112, 1116 (6th Cir. 1991); Flathead-Michigan, 2011 WL 940048 at *4.

Other courts have specifically considered whether a fluctuating financial market permits a party to a contract to rely on the doctrine of impracticability. Citing comment b of the same section of the Restatement, the court in Seaboard Lumber Co. v. United States, 41 Fed. Cl. 401, 416 (Fed. Cl. 1998), noted that "'the continuation of existing market conditions and of the financial situation of the parties are ordinarily not such assumptions, so that mere market shifts or financial ability do not usually effect discharge under the rule stated in this section.'" Rejecting the defense of impracticability, the court reasoned that "[i]f contracts were found to be breachable

20

under such circumstances, there would be few contract breaches which could not be defended against based on such a claim. The state of the market is one of the things on which the parties are gambling when the contract . . . is made." Id. at 416–417.   Applying similar reasoning, the court in Chainworks, Inc. v. Webco Industries, Inc., No. 1:05-CV-135, 2006 WL 461251, *5  (W.D. Mich. Feb. 24, 2006), likewise rejected a financial impracticability defense.  The court found that "[the defendant] cannot, after the fact, alter the contract based on impracticability simply because it may have misread the market and entered into a contract which became a greater financial burden than originally expected."  Id.

Similar to the doctrine of impracticability, "[t]he doctrine of impossibility may extinguish a party's liability under a contract if performance of the party's promise becomes objectively impossible."  Oakwood of Cambridge, L.L.C. v. Kapsa, No. 289590, 2010 WL 2016294, *4 (Mich. Ct. App. May 20, 2010) (citing Roberts v. Farmers Ins. Exch., 737 N.W.2d 332 (2007)). While the unforseeability of a supervening event

> may produce an impossibility sufficient to extinguish liability, Vergote v. K Mart Corp., 404 N.W.2d 711 (1987), under Michigan law '[s]ubsequent events which in the nature of things do not render performance impossible, but only render it more difficult, burdensome, or expensive, will not operate to relieve [a party of its contractual obligations.]' Chase v. Clinton Co., 217 N.W. 565 (1928).

Id.

Michigan decisions on the impossibility doctrine have held that "'unexpected financial difficulty, expense or hardship does not excuse a contractual promissor from performing his undertaking when the contract does not provide otherwise.'"  Flathead-Michigan, 2011 WL 940048 at *4 (quoting Covenant Medical Management, Inc. v. Knepper, 2006 WL 3333021, *5 (E.D. Tenn. 2006) (other citations omitted).   The Flathead court, addressing the same economic

crisis which ESML argues excuses its performance, found that "[b]ecause the economic

fluctuations of the past three years were not "unforeseeable," and Defendants have not supplied

reasons other than the economic downturn for the loan default, this defense is unavailable." Id. at

*5.  The Court in Elavon, 2011 WL 7071066 at *8 emphasized that the "impossibility" invoked

by the party seeking an excuse for non-performance, must render impossible the party's

"performance of their obligations under the [agreement at issue]."  The Elavon court found that

the defendants, who argued that the 2008 financial crisis made their performance impossible,

failed to identify evidence supporting their impossibility argument. Id.

In Ner Tamid Congregation of North Town v. Krivoruchko, 638 F. Supp.2d 913, 928, 933

(N.D. Ill. 2009), the court held that the potential inability to obtain commercial financing is

generally considered a foreseeable risk that can be readily guarded against by including financing

contingency provisions in the contract.  In Ner Tamid, the defendant/purchaser in a real estate

transaction argued that the doctrines of impossibility and impracticability excused his

performance under the contract.  The defendant based his defense in this breach of contract suit

on his inability to obtain the precise financing that he wanted, which, he argued, was a result of

the real estate recession that began in 2007.  Id. at 916.

> But let us assume that the situation in the summer of 2007 was an acute event; Mr.
> Krivoruchko's argument is nonetheless analytically incorrect. The question is not
> whether the "depth of the recession" was foreseeable, but rather, it is whether it
> was foreseeable that a lender might not provide him with financing in connection
> with the purchase of the Ner Tamid property. The foreseeability of that event is
> beyond debate.

Id. at 928.

The court noted that financing can be denied for any number of reasons and, moreover

that "financing was not an assumption underlying the contract at all, let alone a basic

assumption." Id. at 928-29.  In rejecting the defendant's impossibility/impracticability defense, the court further found that the defendant failed to demonstrate that he had tried all practical, available alternatives that would have permitted his performance of the contract.  Id. at 933.

Citing Ner Tamid, the court in YPI 180 N. LaSalle Owner, LLC  v. 180 N. LaSalle II, LLC, 933 N.E.2d 860, 865-66 (Ill. App. Ct. 2010), held that the 2008 financial crisis did not excuse the plaintiff's contractual obligations based on its alleged inability to obtain financing:

> Even if the global credit crisis made it difficult, to nearly impossible, to procure the sought-after commercial financing, this is not the relevant issue. The primary issue is whether it was foreseeable that a commercial lender might not provide Younan and YPI with the financing they sought. See Ner Tamid Congregation of North Town v. Krivoruchko, 638 F. Supp.2d 913, 928 (N.D. Ill. 2009).  Even without the global credit crisis of 2008, it was foreseeable that a commercial lender might not provide Younan and YPI with the financing they sought. See Ner Tamid Congregation of North Town, 638 F. Supp.2d at 928.

Id.

ESML alleges that the 2008 financial crisis affected its ability to obtain the financing necessary for the Nashwauk facility.  For the same reasons identified by the Court herein as to ESML's *force majeure* allegations, the Court finds that the doctrines of impracticability and impossibility are inapplicable and, therefore, do not excuse or delay ESML's performance under the Contract.  It was completely foreseeable that ESML might not secure the necessary financing for the Nashwauk facility.  Given that possibility, MSI/ESML could have conditioned its performance on obtaining such financing.  It failed to do so.

In addition, ESML's allegations with respect to mitigation are scant.  It simply alleges that it "diligently sought financing for the [Nashwauk] Facility."  (Counterclaim ¶ 54 [Doc. No. 80].)  ESML fails to sufficiently allege that it sought all reasonable alternatives in order to perform its obligations under the Contract.  While ESML argues in its opposition memorandum, citing

Paragraph 54 of the Counterclaim quoted above, that "it has alleged that it could not obtain any financing whatsoever" (ESML's Opp'n Mem. at 31 [Doc. No. 374]), the allegation does not support such a sweeping statement.  More importantly, ESML simply fails to allege facts sufficient to support its efforts at mitigation.

Moreover, this is not a case where the terms of the Contract are inconsistent or ambiguous.   As noted herein, any reference to the parties' subjective intent is unnecessary, as their "intent" is expressed in the plain language of the Contract.

Finally, ESML's reliance on the decision of the Minnesota Court of Appeals in Burgi v. Eckes, 354 N.W.2d 514 (Minn. Ct. App. 1984) is inapposite.  In Burgi, a landlord's duty to make major or structural repairs was suspended by reason of economic impossibility where the tenant's filing of bankruptcy resulted in a drastic reduction in the tenant's monetary obligations to the landlord.  Id. at 518.  The case does not apply Michigan law, nor does it involve the inability to obtain financing, or a national economic downturn.  At most, it provides a general statement of Minnesota law as to the doctrines of impossibility or impracticability of performance.

The Court finds that ESML has failed to state a plausible claim for a declaratory judgment that, based on the doctrines of impossibility/impracticability, its duty to perform pursuant to the Contract is excused until the Nashwauk facility is in a position to require the delivery of natural gas.   Accordingly, ESML's count for a declaratory judgment based on the doctrines of impossibility and impracticability is dismissed.

**D.      ESML's Claim for Conversion**

As to ESML's claim for conversion, the underlying basis for this claim is predicated on the authority by which Great Lakes could draw upon the Letter of Credit.  ESML alleges that

Plaintiff's actions in drawing upon the Letter of Credit were without justification, because ESML's performance under the Contract was excused by the *"force majeure* clause and the non-existence of the Nashwauk facility," which the Court construes as the doctrines of impracticability/impossibility.  (Counterclaim, Count III [Doc. No. 80].)   In addition, ESML alleges that Plaintiff's legal right to draw upon the Letter of Credit is "unclear" because "FERC has issued an Order stating that it appears that Great Lakes' rates are unreasonable and unlawful." (Id.)  ESML alleges that Great Lakes should not have taken any action with respect to the Letter of Credit until FERC "has resolved its inquiry."  (Id. ¶ 71.)  Therefore, ESML argues that it has stated a plausible claim for conversion and dismissal is inappropriate.

Because the Court has concluded that ESML cannot state a claim based on those theories, it cannot state a claim for conversion, in any event.  However, as to ESML's allegation that the Letter of Credit was unlawfully drawn upon during the pendency of a rate inquiry, and therefore was unlawfully converted, ESML also fails to state a claim.  First, the terms of the Contract provide that ESML would be charged based on Great Lakes' "maximum rates and charges plus all applicable surcharges in effect from time to time under the applicable Rate Schedule on file with the [FERC] unless otherwise agreed to by the parties in writing."  (Contract ¶ 9, Ex. B to Counterclaim [Doc. No. 80-2].)   The rates at issue are on file with a federal regulatory commission and there is nothing ambiguous or unclear about the rates, as they appear in the Contract.

Second, if the rates in the Contract were found to be unreasonable, 15 U.S.C. 717d(a) provides that FERC will decrease the rates to a reasonable level – it does not provide that FERC is authorized to find the Contract invalid.  Under the terms of the Letter of Credit, if ESML fails

to make payments consistent with the Contract, Great Lakes may draw upon the Letter of Credit

for reimbursement.  (Letter of Credit, Ex. C to Counterclaim [Doc. No. 80-3].)  ESML does not

appear to dispute the fact that it failed to make any payments under the Contract.  A plain reading

of the Letter of Credit and the Contract supports Great Lakes' right to draw upon the Letter of

Credit.  Accordingly, for all of these reasons, ESML's count of conversion fails to state a

plausible claim for relief.

> ### E.      Allegations Regarding Misrepresentation

Although ESML asserts three counts for relief, i.e., conversion and two counts for a

declaratory judgment, factual allegations in ESML's Counterclaim contend that Great Lakes

misrepresented its cost of service to transport natural gas, thereby overcharging MSI/ESML.

(Counterclaim ¶¶ 25-26 [Doc. No. 80].)  In its Opposition Memorandum, ESML contends that

Great Lakes and former Third-Party Defendants, the TransCanada Entities, "were active

participants" in a "scheme" to misrepresent the cost of Great Lakes' service.  (ESML's Opp'n

Mem. at 37 [Doc. No. 374].)

To the extent that ESML intends to plead a count of fraud or misrepresentation, it has not

included a separate count to that effect in the Counterclaim.  Moreover, the bare factual

allegations of misrepresentation in the Counterclaim fail to state such a claim.  Federal Rule of

Civil Procedure 9(b) requires particularized pleading as to the "circumstances" constituting fraud

allegations.  Such "circumstances" include the "time, place and contents of false representations,

as well as the identity of the person making the misrepresentation and what was obtained or given

up thereby."  Bennett v. Berg, 685 F.2d 1053, 1062 (8th Cir. 1982); Stark v. Monson, 07-CV-

4374 (MJD/AJB), 2008 WL 189959, *8 (D. Minn. Jan. 22, 2008).  Conclusory allegations of

fraud are insufficient to satisfy Rule 9(b).  See Commercial Prop. Invs., Inc. v. Quality Inns, Int'l, Inc., 61 F.3d 639, 644 (8th Cir. 1995).   The requirements of Rule 9(b) apply not only to fraud claims, but to any allegations of negligent or intentional misrepresentation.  McGregor v. Uponor, Inc., 09-CV-1136 (ADM/JJK), 2010 WL 55985, *3 (D. Minn. Jan. 4, 2010) (citing Conwed Corp. v. Employers Reinsurance Corp., 816 F. Supp. 1360, 1363 (D. Minn. 1993)).

The factual allegations in the Complaint as to Great Lakes' misrepresentations are simply conclusory allegations, entirely lacking in specificity as to the "who, what, where, when and how" necessary to support a claim under Rule 9(b).  See Drobnak v. Andersen Corp., 561 F.3d 778, 783 (8th Cir. 2009).  Accordingly, to the extent that ESML alleges a misrepresentation claim against Great Lakes, it fails as a matter of law.

### F.      Role of FERC

The Court is unpersuaded by ESML's argument that additional discovery is needed, or that the resolution of complaints lodged with FERC about Great Lake's charged rates makes dismissal inappropriate.

Pursuant to the National Gas Act, FERC is given rate authority over companies that engage in either the sale or the transportation of natural gas.  Section 4 of the Act requires natural gas companies to file all rates and contracts with FERC.  See 15 U.S.C. § 717(c) (2005).  Section 5(a) authorizes FERC to determine whether any rate or charge, or contract affecting such a rate or charge, is unjust and unreasonable, and provides that FERC may determine a just and reasonable rate.  15 U.S.C. § 717d(a) (2012).

". . . [I]t is long established that FERC views pure questions of the interpretation of FERC-approved contracts as falling within the jurisdiction of the district courts.  Portland General

<u>Elec. Co. v. City of Glendale</u>, Civil No. 05-1321-PK, 2007 WL 1655545, *5 (D. Or. June 1, 2007)

(citing <u>Doswell Ltd. P'ship v. Va. Elec. & Power Co.</u>, 61 F.E.R.C. ¶ 61,196 at 61,731 (1992)).   In

a case for declaratory relief involving the sale and purchase of electric energy, the court in

<u>Portland General</u> noted that interpretation of the contract would not, in itself, usurp any FERC

function in determining fair rates or jurisdictionally infringe upon FERC's authority:

> To provide the declaratory relief that [the plaintiff] requests, this court will not be required to make any determination of reasonableness.  Instead, this court will be called upon to interpret specified contractual provisions of the parties' Agreement, without looking beyond the four corners of the document.  Because this court's declaration will neither modify the terms of the Agreement nor evaluate its formulary rates against any standard of fairness, reason, or justice, the interpretation of the contract will not, in itself, constitute an usurpation of any FERC function.

<u>Id.</u>

The Court finds that FERC's inquiry or ruling – the Counterclaim uses both terms – does

not affect whether this Court may rule on Plaintiff's Motion to Dismiss.  In deciding this motion,

the Court is concerned with the terms of the Contract and the interpretation of those terms,

without regard to the reasonableness of the rates charged.  Any determination of reasonableness

of rates is within the jurisdiction of FERC.   What is before the Court and what is before FERC

are entirely distinct issues.  The Court has full authority to rule on Plaintiff's motion, and, in

doing so, the Court does not impinge upon FERC's authority.

### G.    Leave to Amend

In the portion of its opposition argument concerning the now-dismissed Third Party

Defendants, ESML argues that if the Court finds that it has not alleged facts sufficient to show an

injustice occurred so that it may pierce the corporate veil, it should be given leave to amend the

Counterclaim.  (ESML's Opp'n Mem. at 36-38 [Doc. No. 374].)  In its memorandum, ESML

28

includes the following proposed allegations:

> 1. The TransCanada Entities and Great Lakes misrepresented facts to MSI about the quantity of capacity that MSI would need when the [Nashwauk] Facility was fully operational, and the TransCanada Entities and Great Lakes collectively induced MSI to enter into a 25-year contract at the highest Tariff rate.
>
> 2. TransCanada Pipelines Limited has entered into dozens of TSAs with Great Lakes and now owns the largest stake of transmission capacity in the Western zone of Great Lakes' pipeline (running from Emerson to the Central zone), or approximately 49% of the total capacity of the pipeline.
>
> 3. As a result of these TSAs, and due to a known lack of demand in the market for capacity in the Western zone of Great Lakes' pipeline, TransCanada Pipelines Limited and Great Lakes have made it impossible for ESML - Great Lakes' largest non-affiliated customer - to fairly remarket its capacity to third-parties.
>
> 4. TransCanada Pipelines Limited, on the other hand has a distinct advantage over ESML because of the favorable rates that TransCanada Pipelines Limited has obtained in its TSAs with Great Lakes. For example, if a third-party has an option to purchase gas from ESML (which has excess capacity due to greater efficiencies in its [Nashwauk] Facility plans and the advancement of technology) or TransCanada Pipelines Limited - TransCanada Pipelines Limited will always win because it can underbid ESML.

(Id. at 37-38 [Doc. No. 374].)

Courts will grant leave to amend only if the proposed amendment would not be futile. Where the proposed amendment would not withstand a Rule 12(b)(6) motion, denial of leave to amend is appropriate. In re Senior Cottages of America, LLC, 482 F.3d 997, 1001 (8th Cir. 2007). Some of the proposed amended language that concerns the former Third-Party Defendants, the TransCanada Entities, is now moot, as they have been dismissed from the case. To the extent that the proposed amendments concern Great Lakes, the Court finds that the proposed amendments cannot salvage any of the counts in ESML's Counterclaim.

For the reasons identified above, the language in Paragraph 1 fails to include the specific information necessary to support a claim for misrepresentation.  In addition, while the language proposed in Paragraphs 2-4 alleges mitigating circumstances that might be applicable to ESML's declaratory judgment counts, they are wholly conclusory.  They do not allege facts showing a duty on Great Lakes' part to determine the quantity of capacity needed by ESML.

Moreover, in some ways, these mitigation allegations undercut ESML's position.  For example, in Paragraph 3, ESML alleges a "known lack of demand in the market for capacity in the Western zone of Great Lakes' pipeline."  Presumably, MSI was aware of this "known lack of demand" at the time it entered into the Contract.  Moreover, the hypothetical situation in Paragraph 4 alleges a non-existing situation, referring to ESML's "excess capacity due to greater efficiencies in the [Nashwauk] Facility plans."  As the Nashwauk facility is not even operational, an allegation that hypothesizes about its existence provides no basis for ESML's claim and is futile.   For all of these reasons, the Court denies ESML's request for leave to amend its Counterclaim, as the proposed amendments would be futile.

### H.      Rule 12(f) Motion to Strike as Redundant

Finally, Great Lakes also moves the Court for an order striking ESML's declaratory judgment claims (Counts I & II) as redundant.  Although the Court has found that the claims should be dismissed on the merits, it also finds that Counts I and II should be dismissed or stricken as redundant.  This Court has held that where a "proposed counterclaim and the plaintiffs' claim raise identical factual and legal issues[, the] proposed counterclaim is redundant and will be moot upon disposition of the plaintiffs' claims. A redundant declaratory judgment claim is not a proper declaratory judgment claim and should be dismissed." Mille Lacs Band of Chippewa

Indians v. State of Minn., 152 F.R.D. 580, 582 (D. Minn.1993) (citing Aldens, Inc. v. Packel, 524 F.2d 38, 51–51 (3d Cir. 1975)).

"When deciding whether to dismiss a counterclaim as redundant, courts consider whether the declaratory judgment serves a useful purpose." Gratke v. Andersen Windows, Inc., 10-CV-963 (PJS/LIB), 2010 WL 5439763, *3 (D. Minn. Dec. 8, 2010) (citations omitted). Such an analysis "requires consideration of whether resolution of plaintiff's claim, along with the affirmative defenses asserted by defendants, would resolve all questions raised by the counterclaim." Id. (citing Daily v. Federal Ins. Co., 2005 WL 14734 at *6 (N.D. Cal. Jan.3, 2005)). In this case, resolution of Plaintiff's claims, including Defendants' affirmative defenses, would resolve the questions presented by ESML's claims seeking a declaratory judgment based on the *force majeure* clause, or, alternatively, the doctrines of impossibility/impracticability. Accordingly, the Court finds that, even if it had not found that ESML's claims should be dismissed under Rule 12, Counts I and II should be stricken, or dismissed, as redundant.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    Plaintiff's Motion to Dismiss for Failure to State a Claim and to Strike Defendant's Pleading  [Doc. No. 364] is **GRANTED;** and

2.    ESML's Counterclaim (Counts I-III) is **DISMISSED.**

Dated:   May 15, 2012

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Court Judge