## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Great Lakes Gas Transmission Limited Partnership,<br><br>        Plaintiff,<br><br>v.<br><br>Essar Steel Minnesota, LLC; Essar Steel Limited f/k/a Essar Steel Holdings, Ltd.; Essar Steel India Limited f/k/a Essar Steel Limited; and Essar Global Fund Ltd. f/k/a Essar Global Limited,<br><br>        Defendants. | Case No. 09-cv-3037 (SRN/LIB)<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Brian A. Farlow, Hayley Ellison, Worthy W. Walker, Barbara L. Wohlrabe, and David W. Elrod, Elrod PLLC, 500 North Akard Street, Suite 3000, Dallas, TX 75201; David T. Schultz and Julian C. Zebot, Maslon LLP, 90 South 7th Street, Suite 3300, Minneapolis, MN 55402, for Plaintiff.

Douglas H. Flaum, Kevin P. Broughel, and Shahzeb Lari, Paul Hasting LLP, 75 East 55th Street, New York, NY 10022; Eric A. Hirsch, Fried Frank Harris Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004; Lousene M. Hoppe and Nicole M. Moen, Fredrikson & Byron, PA, 200 South 6th Street, Suite 4000, Minneapolis, MN 55402-1425, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter is before the Court on the following motions: (1) Defendant Essar Steel Minnesota LLC's Motion to Dismiss for Lack of Subject Matter Jurisdiction [Doc. No. 856]; (2) Plaintiff's Motion for Leave to File Second Amended Complaint [Doc. No. 812]; (3) Plaintiff's Motion in Limine [Doc. No. 835]; and (4) Defendant's Motion in

Limine [Doc. No. 842].  For the reasons set forth below, the Court denies Defendant's

Motion to Dismiss and Plaintiff's Motion for Leave to File Second Amended Complaint;

and the Court denies, without prejudice, Plaintiff's and Defendant's Motions in Limine.

## II.    BACKGROUND

### A. The Parties

Although the facts of this matter are thoroughly detailed in prior orders of this

Court, the Court discusses the relevant facts of the case below.  Plaintiff Great Lakes Gas

Transmission Limited Partnership ("Plaintiff" or "Great Lakes") is a partnership entity

composed of: "(1) TransCanada GL, Inc., a corporation organized under the laws of the

state of Delaware, (2) TC GL Intermediate Limited Partnership, a Delaware limited

partnership, and (3) Great Lakes Gas Transmission Company, a corporation organized

under the laws of the state of Delaware."  (See First Am. Compl. ¶ 2 [Doc. No. 35].)  One

of these partners, TC GL Intermediate Limited Partnership is, in turn, composed of: (1)

TC PipeLines GP, Inc., a Delaware corporation, and (2) TC PipeLines, LP, which is a

publicly-traded Delaware master limited partnership.  (See id. ¶ 3.)  TC PipeLines, LP is

composed of public unitholders and two partners, TC PipeLines, GP, Inc. and TransCan

Northern Ltd.  (See id. ¶¶ 2–4; see also Pl.'s Mem. at 37–38 [Doc. No. 862].)

Essar Steel Minnesota, LLC ("ESML" or "Defendant") is a Minnesota limited

liability corporation with its principal place of business in Minnesota.  (See First Am.

Compl. ¶ 5 [Doc. No. 35].)  Essar Steel Holdings Ltd. is a foreign company that is

incorporated under the laws of Mauritius and has its principal place of business in

Mauritius.  (See id. ¶ 6.)  Essar Steel Limited is a foreign company that is incorporated

under the laws of India, has a principal place of business in India, and is registered to conduct business in the State of New York.  (<u>See</u> <u>id.</u> ¶ 7.)  Essar Global Limited is a foreign company incorporated under the laws of the Cayman Islands with offices in Asia, Africa, Europe, and the Americas, and although it has its principal place of business in Dubai, it has an office in the State of New York.  (<u>See</u> <u>id.</u> ¶ 8.)

In Plaintiff's First Amended Complaint, the controlling version of the Complaint in this case, Great Lakes alleges that the Court has diversity jurisdiction over this case as the matter in controversy exceed $75,000 and is between citizens of different States.  (<u>See</u> <u>id.</u> ¶ 9.)

### B.  The Contract and the Parties' Dispute

The underlying controversy between the parties stems from Defendants' breach of contract.  The contract ("Contract") was initially executed in 2006 between Plaintiff and Minnesota Steel Industries ("MSI").  (Ellison Aff., Ex. 2 "Contract" [Doc. No. 681-2].)  However, in 2007, Defendant ESML purchased MSI, and "expressly and/or impliedly assumed all of [MSI's] liabilities," including MSI's contractual obligations.  (<u>See</u> First Am. Compl. ¶ 16 [Doc. No. 35]; <u>see also</u> First Am. Answer ¶ 19 [Doc. No. 314].)  ESML is affiliated with several foreign entities, which are also Defendants in this action – Essar Steel Limited, formerly known as Essar Steel Holdings, Ltd.; Essar Steel India Limited, formerly known as Essar Steel Limited; and Essar Global Fund Ltd., formerly known as Essar Global Limited ("Foreign Essar Defendants").

The Contract required Great Lakes, a regulated interstate natural gas pipeline, to transport up to 55,000 dekatherms of natural gas firm capacity per day on MSI's behalf.

3

(See First Am. Compl. ¶ 17 [Doc. No. 35].)  The Contract, otherwise known as the

Transportation Services Agreement ("TSA"), was effective July 1, 2009 through March

31, 2024.  (Id.)  In exchange for Plaintiff's transportation of natural gas, the Contract

required MSI to pay Great Lakes the maximum reservation rates and charges on a

monthly basis, pursuant to the applicable rate schedule reflected in Plaintiff's gas tariff

(the "Tariff") on file with the Federal Energy Regulatory Commission ("FERC").  (Id.)

The TSA specifically provides:

> This Agreement shall incorporate and in all respects be subject to the
> "General Terms and Conditions" and the applicable Rate Schedule (as
> stated above) set forth in Transporter's [Plaintiff's] FERC Gas Tariff,
> Second Revised Volume No. 1, as may be revised from time to time.
> Transporter may file and seek Commission approval under Section 4 of the
> Natural Gas Act (NGA) at any time and from time to time to change any
> rates, charges or provisions set forth in the applicable Rate Schedule (as
> stated above) and the "General Terms and Conditions" in Transporter's
> FERC Gas Tariff, Second Revised Volume No. 1, and Transporter shall
> have the right to place such changes in effect in accordance with the NGA,
> and this Agreement shall be deemed to include such changes and any such
> changes which become effective by operation of law and Commission
> Order, without prejudice to Shipper's [ESML's] right to protest the same.

(See Moen Decl., Ex. 5 "TSA," ¶ 12 [Doc. No. 859-1].)  Thus, the TSA expressly

incorporated the terms of the Tariff.

In addition, pursuant to the Contract, MSI was obligated to pay all applicable

surcharges.  (First Am. Compl. ¶ 17 [Doc. No. 35].)  The parties agree that the Tariff

"provide[d] terms and conditions that govern[ed] the parties' rights and obligations."

(See 10/4/12 Hr'g Tr. at 33, 35, 41 (statements by ESML's counsel) [Doc. No. 470].)

In October 2009, Great Lakes filed this action against the above named Defendants, alleging that ESML failed to make the first payment of $190,190 due on August 17, 2009, and has failed to make all subsequent payments.  (See generally Compl. [Doc. No. 1]; First Am. Compl. ¶ 20 [Doc. No. 35].)  Plaintiff alleges four counts against Defendants.  In Count One, Great Lakes alleges that ESML is liable for breach of contract and anticipatory repudiation.  (See id. ¶¶ 48–54.)  Plaintiff contends that because "both the Tariff and the TSA form the contract between Great Lakes and Essar, the claim for breach of contract by necessity is based on both."  (See Pl.'s Mem. at 2 [Doc. No. 862].)  In Count One, Great Lakes additionally argues that ESML is liable for damages for breaching the Contract.  (See First Am. Compl. ¶ 53 [Doc. No. 35].)

In Count Two, Plaintiff claims that "[u]nder the equitable theories or remedies of piercing the corporate veil, alter ego and/or mere instrumentality, the corporate structures of each of the Essar entities should be disregarded, and each of the foreign Essar entities should be held liable for the damages recoverable by Great Lakes as a result of [ESML's] breach of and anticipatory repudiation of the Contract."  (See id. ¶ 58.)  In Count Three, Plaintiff claims that "[a]s a result of the Essar entities' joint enterprise or joint venture, each of the foreign Essar entities should be held liable for the damages recoverable by Great Lakes as a result of the breach and anticipatory repudiation of the Contract."  (See id. ¶ 61.)  Finally, in Count Four, Great Lakes alleges that because ESML was acting as the agent for the foreign Essar entities, all of the foreign Essar entities should be held liable for the damages suffered by Great Lakes.  (See id. ¶ 63.)

### C. Procedural Posture

As this case was filed several years ago, the Court has already had the opportunity to rule on the merits of Plaintiff's breach of contract claim and has determined that Defendants breached the Contract and are therefore liable for paying Plaintiff damages. The amount of damages due remains an unsettled issue, however.

In the Fall of 2014, the parties were preparing for trial on the appropriate discount rate to apply to the damages due to Plaintiff.  Plaintiff filed a Motion in Limine [Doc. No. 835], as did Defendants [Doc. No. 842].  When this case was on the eve of trial, Defendants alerted the Court via letter [Doc. No. 811] that they believed that the Court lacked subject matter jurisdiction to decide this case.  Defense counsel explained that they "first became aware" of the issue when they were preparing their trial brief.  (See Flaum Letter at 1 [Doc. No. 811].)  Specifically, Defendants uncovered that Plaintiff's initial disclosure about the parties' citizenship was incomplete as Great Lakes failed to disclose the citizenship of TC PipeLines, LP's hundreds or thousands of public unitholders. (See id.)  Defense counsel argued that if any of the public unitholders was a Minnesota citizen, then diversity jurisdiction is incomplete in this case.  (See id. at 2.)

The Court permitted Plaintiff to file a Motion for Leave to File a Second Amended Complaint to assert federal question jurisdiction.  (See Hr'g Tr. 4:7–12, Oct. 15, 2014 [Doc. No. 855].)  Plaintiff duly filed this motion [Doc. No. 812], and submitted a memorandum in support [Doc. No. 814].  In Plaintiff's proposed Second Amended Complaint, Great Lakes sought to add a section alleging subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the Natural Gas Act, 15 U.S.C. § 717u, because

according to Plaintiff its claims "depend on resolution of substantial predicate questions of federal law."  (See Proposed Second Am. Compl. [Doc. No. 815-2].)  Defendants filed briefing in response to Plaintiff's motion and continued to raise concerns about the Court's subject matter jurisdiction in this case.  (See Defs.' Mem. in Opp'n at 1–4 [Doc. No. 823].)  The Court heard oral argument on Plaintiff's motion on October 16, 2014.

During the October 16, 2014 hearing, the Court instructed Defendants to file a formal Motion to Dismiss.  (See Hr'g Tr. 4:18–22 [Doc. No. 855].)  Defendant ESML filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction on October 31, 2014 [Doc. No. 856].  Defendant also filed a memorandum in support [Doc. No. 858], a declaration and several attachments [Doc. No. 859].  In response, on November 21, 2014, Plaintiff filed an opposition memorandum [Doc. No. 863], with an affidavit and an exhibit [Doc. No. 863].  On December 5, 2014, ESML filed a reply brief [Doc. No. 864]. The Court heard oral argument on Defendant's motion on December 12, 2014.

## III.    MOTION TO DISMISS

### A. Standard of Review

Defendant argues that the Court lacks subject matter jurisdiction to hear this case and seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1).  (See Def.'s Mot. to Dismiss [Doc. No. 856].)  "Federal courts are courts of limited jurisdiction.  The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception."  Godfrey v. Pulitzer Pub. Co., 161 F.3d 1137, 1141 (8th Cir.1998) (internal quotations and citations omitted).  Accordingly, this Court is obligated to dismiss any

action over which it lacks federal subject matter jurisdiction.  E.g., Steel Co. v. Citizens For A Better Environment, 523 U.S. 83, 94 (1998).

On a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, the court must first "distinguish between a 'facial attack' and a 'factual attack.'"  Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990).  If the movant presents only a facial attack, the court must confine itself to the pleadings and the nonmoving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6).  Id.  Thus the court "must accept all factual allegations in the pleadings as true and view them in the light most favorable to the nonmoving party."  Hastings v. Wilson, 516 F.3d 1055, 1058 (8th Cir. 2008).

Where, in contrast, the movant presents a factual attack, the court may consider matters outside the pleadings and the non-moving party does not have the benefit of the safeguards of Rule 12(b)(6).  Osborn, 918 F.2d at 729 n.6.  But the motion is not thereby converted into one for summary judgment.  Capitol Leasing Co. v. FDIC, 999 F.2d 188, 191 (7th Cir. 1993) (stating that court could not "have transformed the motion to dismiss into one for summary judgment" because "the question of jurisdiction is inappropriate for summary judgment").  Here, Defendant presents a factual attack because ESML's argument is based on jurisdictional facts that were not included in the pleadings, such as the citizenship of one entity that was not adequately disclosed on the face of Plaintiff's First Amended Complaint.

A court may have subject matter jurisdiction either because it has diversity jurisdiction, pursuant to 28 U.S.C. § 1332, or federal question jurisdiction, pursuant to 28

U.S.C. § 1331.  Defendant argues that this Court lacks both diversity jurisdiction and federal question jurisdiction.  (See Def.'s Mem. at 3, 6 [Doc. No. 858].)  Below, the Court addresses its subject matter jurisdiction under § 1332 and § 1331.

**B.  Diversity Jurisdiction**

The First Amended Complaint alleges that this Court has diversity jurisdiction over this case, pursuant to 28 U.S.C. § 1332(a)(1) and (a)(2).  (See First. Am. Comp. ¶ 9 [Doc. No. 35].)  Diversity jurisdiction "requires an amount in controversy greater than $75,000 and complete diversity of citizenship of the litigants."  OnePoint Solutions, LLC v. Borchert, 486 F.3d 342, 346 (8th Cir. 2007) (citing 28 U.S.C. § 1332(a)); see E3 Biofuels, LLC v. Biothane, LLC, No. 14-1894, 2015 WL 1314936, *2 (8th Cir. Mar. 25, 2015).  "Complete diversity of citizenship exists where no defendant holds citizenship in the same state where any plaintiff holds citizenship."  OnePoint Solutions, LLC, 486 F.3d at 346.  "When one of the parties to the action is a limited partnership, the citizenship of each general and limited partner must be considered in determining whether complete diversity of citizenship exists."  Barclay Square Properties v. Midwest Fed. Sav. & Loan Ass'n of Minneapolis, 893 F.2d 968, 969 (8th Cir. 1990) (citing Stouffer Corp. v. Breckenridge, 859 F.2d 75, 76 (8th Cir. 1988)); see Buckley v. Control Data Corp., 923 F.2d 96, 97 (8th Cir. 1991) (explaining that "for diversity purposes, the citizenship of a limited partnership is the citizenship of each of its partners, both general and limited").

Here, Plaintiff has failed to establish the citizenship of one of its limited partners, TC PipeLines, LP.  TC PipeLines, LP is a publicly-traded Delaware master limited partnership (MLP) with public unitholders and two partners.  (See First Am. Compl. ¶¶

2–5 [Doc. No. 35].)  "A master limited partnership is a limited partnership whose

interests (known as 'common units') are publicly traded."  <u>Wood v. Walton</u>, No. WDQ–

09–3398, 2010 WL 458574 at *1 n. 3 (D. Md. Feb.2, 2010) (citing Ann E. Conaway

Stilson, <u>The Agile Virtual Corporation</u>, 22 Del. L. Corp. L. 497, 524–25 (1997)).

Although Plaintiff alleged the citizenship of two of TC PipeLines, LP's partners in its

First Amended Complaint, it did not allege the citizenship of TC PipeLines, LP's public

unitholders.  (<u>See</u> First Am. Compl. ¶ 3 [Doc. No. 35].)  However, during oral argument,

Plaintiff's counsel stated that, likely, at least one unitholder's citizenship is Minnesota,

and therefore, TC PipeLines, LP is not completely diverse from Defendants.  (<u>See</u> Hr'g

Tr. 16:11–14.)

　　　　Plaintiff contends that the unitholders' citizenship should not be considered when

determining the citizenship of TC PipeLines, LP.  (<u>See</u> Pl.'s Mem. at 38 [Doc. No. 862].)

Great Lakes argues that "[a]t the time this lawsuit was filed in federal court, <u>no authority</u>

squarely addressed the citizenship of MLPs."  (<u>See</u> <u>id.</u> at 39.)  Specifically, Plaintiff

asserts that "no controlling authority from the Supreme Court or the Eighth Circuit

requires consideration of an MLP's public unitholders for purposes of determining its

citizenship."  (<u>See</u> <u>id.</u> at 38.)  The Court disagrees.

　　　　The Supreme Court's holding in <u>Carden v. Arkoma Associates</u>, 494 U.S. 185

(1990), controls.  In <u>Carden</u>, the Court held that a limited partnership's citizenship is

determined by the citizenship of all of its general and limited partners.  <u>Id.</u> at 195 (finding

that "[i]n sum, we reject the contention that to determine, for diversity purposes, the

citizenship of an artificial entity, the court may consult the citizenship of less than all of

the entity's members").  The Court acknowledged that its case law pertaining to

citizenship and diversity jurisdiction is "technical, precedent-bound, and unresponsive to

policy considerations raised by the changing realities of business organization."  Id. at

196.  After acknowledging the inconsistency between its own precedent and the realities

of the business world, the Court noted that it was Congress's role and responsibility to

make "further adjustments."  Id. at 196–97 (finding that "the course we take today does

not so much disregard the policy of accommodating our diversity jurisdiction to the

changing realities of commercial organization, as it honors the more important policy of

leaving that to the people's elected representatives," and explaining that Congress made

such a policy decision in 1958 when it passed a law "providing that a corporation shall be

deemed a citizen not only of its State of incorporation but also 'of the State where it has

its principal place of business'").

Although the Supreme Court was analyzing the citizenship of limited partnerships

in Carden, as opposed to *master* limited partnerships, the principles articulated in Carden

apply with equal force to this case.  Therefore, TC PipeLines, LP' citizenship must be

determined by looking at the citizenship of *all* of its limited partners.  See Carden, 494

U.S. at 195; GMAC Commercial Credit LLC v. Dillard Dep't Stores, Inc., 357 F.3d 827,

829 (8th Cir. 2004) (explaining that "the Supreme Court has repeatedly resisted

extending the corporation exception [about determining citizenship] to other entities,"

and finding that a district court's diversity jurisdiction in a suit by or against an

unincorporated entity depends on the citizenship of *all* the members).

11

The Court agrees with Plaintiff that these unitholders have "limited influence" on matters affecting the operations of TC PipeLines, LP.  (See Pl.'s Mem. at 40 [Doc. No. 862].)  In fact, the unitholders may be more accurately labeled "stockholders" to reflect the "economic reality of how an MLP's units are held."  (See id.)  However, the economic reality of the unitholders' roles and positions is immaterial to the Court's holding.  See Carden, 494 U.S. at 196–97.  Moreover, simply because the Internal Revenue Code provides that a publicly traded partnership "shall be treated as a corporation" for purposes of determining taxes, see 26 U.S.C. § 7704(a), does not alter the fact that partnerships are *not* treated as corporations for purposes of determining citizenship.  (See Def.'s Reply at 5 [Doc. No. 864]; cf. Pl.'s Mem. 40 [Doc. No. 862].)

Although the Eighth Circuit has not explicitly addressed how courts are to determine the citizenship of MLPs, at least six district courts outside this Circuit have addressed this issue.  All have held that MLPs should be treated like limited partnerships, and not corporations, for purposes of determining citizenship.  See, e.g., Trafigura AG v. Enter. Products Operating LLC, 995 F. Supp. 2d 641, 646 (S.D. Tex. 2014) (adhering to the "bright-line rule announced" in Carden and holding that complete diversity was lacking in this case because at least a dozen of the unitholders were aliens, and thus there were aliens on both sides of the litigation, which destroyed complete diversity); Grynberg v. Kinder Morgan Energy Partners, L.P., No. 14-CV-1832-WJM-KMT, 2014 WL 3586216, *2 (D. Colo. July 21, 2014), appeal docketed, No. 14-1465 (10th Cir. Nov. 6, 2014) (relying on Carden's "firmly established" rule and holding that petitioner failed to demonstrate citizenship of unitholders and thus the court could not properly determine if

subject matter jurisdiction existed; petitioner claimed that it would be too difficult to discern the citizenship of those unitholders and therefore failed to satisfy the court's order to show cause); Gonyer v. Enbridge Energy, Ltd. P'ship, No. 1:13-CV-796, 2014 WL 1255915, *1–*2 (W.D. Mich. Mar. 26, 2014) (holding that diversity jurisdiction is destroyed because the citizenship of at least some of the unitholders was the same as the defendant's citizenship); Ada Cnty. Highway Dist. v. Nw. Pipeline GP, No. 1:12-CV-00184-BLW, 2012 WL 4737869, *1 (D. Idaho Oct. 3, 2012) (finding that removal to federal court was not objectively reasonable because complete diversity was not established for one of the relevant entities, which was a master limited partnership; and noting that the MLP had over 73,000 units, and thus "it would prove very difficult . . . to demonstrate complete diversity as the citizenship of a limited partnership"); Vosburg v. Williams Field Servs. Co., No. 3:11-CV-1624, 2011 WL 3881277, *2–*3 (M.D. Pa. Sept. 2, 2011) (holding that the plaintiff failed to allege enough facts to sustain diversity jurisdiction; and allowing the plaintiff the chance to amend its complaint to allege citizenship of all the component unitholders); Williams Field Servs. Co., LLC v. Kalmanowicz, 3:11-CV-1634, 2011 WL 3881471, *2 (M.D. Pa. Sept. 2, 2011) (holding that the amended complaint failed to show the existence of subject matter jurisdiction because the plaintiff failed to allege the citizenship of unitholders; and providing the plaintiff an opportunity to amend its complaint to prove diversity of citizenship).  Many of these courts rely upon the Supreme Court's holding in Carden.

This Court agrees with several other district courts that have already ruled that MLPs must be treated as limited partnerships for the purpose of establishing citizenship.

Although public unitholders may be more functionally equivalent to stockholders in a corporation, the court is bound to follow Carden, and must determine TC PipeLines, LP's citizenship by looking to the citizenship of all of its partners, including the public unitholders.  Because Plaintiff's counsel declined the opportunity to reconstruct the public unitholders' citizenship, and conceded during oral argument that at least one unitholder's citizenship is likely Minnesota, the Court holds that complete diversity between the parties does not exist, and Plaintiff has accordingly failed to establish diversity jurisdiction in this case.

## C.  Federal Question Jurisdiction

Although Plaintiff only pled diversity jurisdiction in its First Amended Complaint, the Court may nevertheless determine that it has federal question jurisdiction based on the underlying facts alleged in the First Amended Complaint.  See Jones v. Freeman, 400 F.2d 383, 387 (8th Cir. 1968) (finding that federal question jurisdiction existed based on the facts of the case, "although [the facts were] not [pled] artfully").  The Court is encouraged to construe even inartfully pled facts to find "a remotely plausible federal claim" particularly when "the parties and the courts have already made [a] vast expenditure of resources," as the parties and the Court have done so here.  See Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc., 35 F.3d 1226, 1242 (8th Cir. 1994); see also Mummelthie v. City of Mason City, Ia., 873 F. Supp. 1293, 1305 (N.D. Iowa 1995) aff'd sub nom., 78 F.3d 589 (8th Cir. 1996).

Federal question jurisdiction exists if the "well-pleaded complaint" establishes jurisdiction through one of two means, or portals.  Williams v. Ragnone, 147 F.3d 700,

702 (8th Cir. 1998) (citing Franchise Tax Bd. v. Construction Laborers Vacation Trust,

463 U.S. 1, 27–28 (1983)).  The first portal to federal question jurisdiction exists when

"federal law creates the cause of action."  Id.  The second portal exists if the "plaintiff's

right to relief necessarily depends on resolution of a substantial question of federal law.'"

Franchise Tax Bd., 463 U.S. at 28; see also Louisville & N.R. Co. v. Rice, 247 U.S. 201,

203 (1918) (explaining that "[a] suit arises under an act of Congress when 'it really and

substantially involves a dispute or controversy respecting the validity, construction or

effect of such a law, upon the determination of which the result depends'") (internal

quotations and citation omitted).

     A plaintiff may avoid the first type of federal question jurisdiction by exclusively

relying on state law in the complaint.  See Caterpillar, Inc. v. Williams, 482 U.S. 386,

392 (1987).  Defendants seeking to remove the case to federal court are "not permitted to

inject a federal question into an otherwise state-law claim and thereby transform the

action into one arising under federal law."  Gore v. Trans World Airlines, 210 F.3d 944,

948 (2000).

     As to the second portal of federal question jurisdiction, there is no "single, precise,

all-embracing test for jurisdiction over federal issues embedded in state-law claims

between nondiverse parties."  Baker v. Martin Marietta Materials, Inc., 745 F.3d 919, 924

(8th Cir. 2014) (internal quotations and citations omitted).  To determine whether a case

fits "within th[is] special and small category," Empire Healthchoice Assurance, Inc. v.

McVeigh, 547 U.S. 677, 699 (2006), "the question is, does a state-law claim necessarily

raise a stated federal issue, actually disputed and substantial, which a federal forum may

15

entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." Grable & Sons Metal Prods., Inc. v. Darue Engineering & Mfg., 545 U.S. 308, 314 (2005).

The United States Supreme Court has firmly established that access to the federal courts through either portal may not be established through a federal defense. Caterpillar, 482 U.S. at 393. In Caterpillar, the Supreme Court held that a federal defense, including a preemption defense, does not provide a basis for removal, "even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue in the case." Id. (citing Franchise Tax Bd., 463 U.S. at 12). Below, the Court considers whether Plaintiff's Complaint establishes federal question jurisdiction under either of the two portals discussed above.

### 1.  Federal Law Does Not Create Plaintiff's Causes of Action

The Supreme Court discussed this first portal of "arising under" federal question jurisdiction in Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1 (1983). In Franchise Tax Bd., the Court explained that a "vast majority" of cases that come within this grant of jurisdiction arise under federal law because federal law creates the cause of action. See 463 U.S. at 8–9. A claim brought under 42 U.S.C. § 1983 is a prime example of federal law creating a plaintiff's cause of action. See 42 U.S.C. § 1983 (2014) (stating that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured

by the Constitution and laws, *shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .*") (emphasis added).

### a. Express Cause of Action under the NGA

Here, Defendant argues that federal law does not create an express private cause of action, under which Plaintiff may sue. (<u>See</u> Def.'s Mem. at 7 [Doc. No. 858].) Specifically, ESML contends that the Natural Gas Act ("the NGA") does not provide Great Lakes with a private cause of action to seek damages for a violation of the Tariff. (<u>See</u> <u>id.</u>) Plaintiff appears to concede that federal law does not create an express private cause of action. (<u>See</u> Pl.'s Mem. at 16 (stating "the NGA does not provide a private cause of action") [Doc. No. 862].)

The Court holds that although the NGA vests federal district courts with exclusive jurisdiction over a specific set of cases, the NGA does not create an express right of action for Plaintiff to sue. Section 717u of the NGA provides that district courts have "exclusive jurisdiction of violations" of the NGA, or violations of "the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this chapter or any rule, regulation, or order thereunder." <u>See</u> 15 U.S.C. § 717u. The Supreme Court of the United States explained in <u>Pan American Petroleum Corp. v. Superior Court of Delaware</u>, that "'[e]xclusive jurisdiction' is given [to] the federal courts but it is 'exclusive' only for suits that may be brought in the federal courts. Exclusiveness is a consequence of having jurisdiction, not the generator of jurisdiction . . ." <u>See</u> 366 U.S. 656, 664 (1961); <u>see also</u> <u>Manning v. Merrill Lynch Pierce Fenner & Smith, Inc.</u>, 772 F.3d 158, 167 n.10 (3d Cir.

2014), appeal docketed, No. 14-1132 (U.S. Mar. 18, 2015) (explaining that "[i]n reality,

Pan American stands for the proposition that cases otherwise falling outside the scope of

the district courts' *original jurisdiction* are not brought within it by virtue of an exclusive

jurisdiction provision.") (emphasis original) (citing In re W. States Wholesale Natural

Gas Antitrust Litig., 346 F. Supp. 2d 1123, 1130 (D. Nev. 2004)); Columbia Gas

Transmission, LLC v. Singh, 707 F.3d 583, 591 (6th Cir. 2013) (finding that "[s]ection

717u provides federal jurisdiction, but it does not create an action," and holding that

section 717u does not provide the plaintiff with access to a federal forum); see also Paul

M. Coltoff, et al., 24 Federal Procedure, Lawyers Edition § 56:676 (2015) (explaining

that "[b]efore federal jurisdiction is exclusive, a case must arise under the Natural Gas

Act").

Thus, section 717u does not create a cause of action, but merely states that federal

district courts have exclusive jurisdiction over cases that otherwise arise under federal

law or involve a substantial question of federal law.  See also Cal. ex rel. Lockyer v.

Dynegy, Inc., 375 F.3d 831, 843 (9th Cir. 2004), opinion amended on denial of reh'g on

other grounds, 387 F.3d 966 (9th Cir. 2004) (explaining that the NGA does not give rise

to a private cause of action for damages); Pacificorp v. Nw. Pipeline GP, No. CV 10-99-

PK, 2010 WL 3199950, *4 (D. Or. June 23, 2010) report and recommendation adopted,

No. CIV. 10-99-PK, 2010 WL 3219533 (D. Or. Aug. 9, 2010) (same).

Here, Plaintiff's claims for breach of contract, damages for breach of contract,

corporate veil piercing, joint venture liability, and agency liability do not arise from

federal causes of action expressly created by the NGA.  (See First Am. Compl. ¶¶ 48–63

[Doc. No. 35].)  It is true that, at all material times, Plaintiff's pipeline has been a regulated interstate pipeline.  (See id. ¶¶ 12–13.)  However, Plaintiff is master of its complaint, see Franchise Tax Bd., 463 U.S. at 22, and Plaintiff may avoid the first portal of federal question jurisdiction by exclusively relying on state law in its Complaint, see Caterpillar, 482 U.S. at 392.  Here, Plaintiff did not plead that its claims arise from the NGA because the NGA does not provide an express cause of action for Plaintiff to sue.  Therefore, Great Lakes' causes of action are not created by the NGA.

Similarly, the Court finds that Plaintiff's causes of action are not created by the Tariff.  (See Moen Decl., Exs. 6, 7 [Doc. No. 859-2].)  Rather, Plaintiff's right to sue for breach of contract, corporate veil piercing, joint venture liability, and agency liability is based on state common law.  In sum, the Court finds that Plaintiff has failed to demonstrate that federal law expressly creates Plaintiff's causes of action.

### b.  Implied Cause of Action under the NGA

Although Plaintiff concedes that the NGA does not explicitly provide a private cause of action, Great Lakes contends that its action arises under federal law because the NGA requires transporters to charge reasonable rates and refrain from granting a preference or advantage to any of its shippers.  (See Pl.'s Mem. at 27–28 [Doc. No. 862].)  In other words, Great Lakes argues that because section 717c of the NGA prohibits "undue preference or advantage," section 717c necessarily also implicitly requires Plaintiff to collect on its Tariff because Great Lakes would advantage one shipper over others if it sought "compensation for breach of the tariff from one shipper but not another."  (See id. at 28); 15 U.S.C. § 717c(b) (providing that "[n]o natural-gas company

shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service"). The Court reads Plaintiff's argument as suggesting that the NGA provides an implied cause of action because it requires Plaintiff to sue to collect unpaid tariff rates.

Plaintiff analogizes the duty of the transporter to collect tariff rates under the NGA to a carrier's duty to collect tariff rates under the Federal Communications Act ("FCA") and the Interstate Commerce Act ("ICA"). (See Pl.'s Mem. at 25 [Doc. No. 862].) When the ICA still had a filed tariff requirement, the ICA mirrored the Federal Communications Act ("FCA") in prohibiting carriers from charging, demanding, collecting, or receiving a greater or less or different compensation than the value specified in the carrier's tariff. See 47 U.S.C. § 203(c) (FCA); 49 U.S.C. § 6(7) (1994) (ICA); see Ivy Broad. Co. v. Am. Tel. & Tel. Co., 391 F.2d 486, 494 (2d Cir. 1968). In Louisville & N.R. Co. v. Rice and Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd., the Supreme Court read this requirement in the ICA as providing "arising under" federal question jurisdiction. See Rice, 247 U.S. 201, 202 (1918) (holding that the plaintiff's action arises under federal law because the ICA required the "carrier to collect and consignee to pay all lawful charges duly prescribed by the tariff in respect of every shipment," so that "their duty and obligation grow out of and depend upon that act"); Thurston, 460 U.S. 533, 535 (1983) (same). Great Lakes contends that the right to sue under the NGA is similar to the right

to sue that the Supreme Court identified in the ICA. (See Pl.'s Mem. at 25 (citing Rice, 247 U.S. at 202; Thurston, 460 U.S. at 535) [Doc. No. 862]).  Plaintiff argues that because courts have held that federal question jurisdiction exists for carriers seeking unpaid ICA and FCA tariff dues, so too does federal question jurisdiction exist in this case.

In opposition, Defendant argues that unlike the FCA and the ICA, the NGA does not require transporters to collect on their tariffs.  (See Def.'s Mem. at 20 [Doc. No. 858].)  Defendant claims that the NGA does not use precisely the same language as the FCA and the ICA use to prohibit a shipper from receiving or collecting a greater or less or different compensation than the value specified in the applicable tariff.  See 15 U.S.C. § 717c(b).  Moreover, ESML argues that the NGA does not require transporters to enforce their obligation to collect tariff rates because shippers and customers may enter into private contracts.  (See Def.'s Mem. at 20 [Doc. No. 858].)

The Court finds Defendant's reasoning flawed.  First, under 15 U.S.C. § 717c(b), carriers are prohibited from transporting or selling natural gas in a manner that unduly preferences or advantages one customer over another.  See 15 U.S.C. § 717c(b).  A court could potentially read this provision – in the same way that comparable provisions in the FCA and ICA have been interpreted – as requiring transporters to collect on their tariffs. Because the NGA was modeled on the ICA, the FCA, and the Federal Power Act ("FPA"), a court could interpret analogous provisions of the different statutes similarly. See Verizon Commc'ns, Inc. v. F.C.C., 535 U.S. 467, 478 n.3 (2002) (noting that the ICA was "the model for subsequent federal public-utility statutes" such as the FPA, the FCA,

and the NGA); Ark. La. Gas Co. v. Hall, 453 U.S. 571, 577 n.7 (1981) (explaining that

because "the relevant provisions of the [NGA and the FPA] 'are in all material respects

substantially identical,'" the Court "follow[ed] [its] established practice of citing

interchangeably decisions interpreting the pertinent sections of the two statutes.")

(internal quotations and citations omitted); Northwestern Pub. Serv. Co. v. Mont.-Dakota

Utils. Co., 181 F.2d 19, 22 (D.C. Cir. 1950), aff'd, Mont.-Dakota Utils. Co. v.

Northwestern Pub. Serv. Co, 341 U.S. 246 (1951) (explaining that because "[t]he plan or

scheme of the Federal Power Act is analogous to that of the Interstate Commerce Act,"

decisions decided under the ICA "should be controlling" for cases decided under the

FPA); but see Nw. Cent. Pipeline Corp. v. Mesa Petroleum Co., 576 F. Supp. 1495, 1502

n.10 (D. Del. 1983) (noting that the fact that Thurston does not discuss cases decided

under the NGA may be indicative of the Supreme Court's belief that "a different rule

should apply" to cases decided under the NGA as opposed to cases decided under the

ICA).

Second, simply because parties subject to the NGA may form private contracts

that incorporate federal tariffs does not suggest that the NGA does not require carriers to

collect on their tariffs.  Therefore, although Defendant implies that the existence of

private contracts is incompatible with requiring transporters to collect on their tariffs, the

Court finds that the NGA could simultaneously permit private contracts, which

incorporate FERC tariffs, *and* require transporters to collect on their tariffs.  Accordingly,

the Court finds Defendant's basis for distinguishing FCA and ICA case law erroneous.

However, even assuming that Defendant's bases for distinguishing FCA and ICA case law are erroneous, the law is not particularly instructive for the Court to determine whether Plaintiff's action "arises under" federal law, for purposes of the first portal of federal question jurisdiction.

For instance, in Rice, the Supreme Court held that it had federal question jurisdiction because the plaintiff's cause of action to recover unpaid fees due under a tariff, which was filed pursuant to the ICA, arose under federal law.  See Rice, 247 U.S. at 203.  Critically, however, the Rice Court did not clarify whether jurisdiction arose under the first portal, or second portal, of federal question jurisdiction.  In other words, the Court did not clarify whether jurisdiction existed because the ICA created an express or implied private cause of action for the plaintiff to sue, or jurisdiction existed because the Court was required to analyze a substantial and disputed federal issue, i.e. provisions of the federal tariff.

On the one hand, the Supreme Court explained that the action arose under federal law because the ICA required the "carrier to collect and consignee to pay all lawful charges duly prescribed by the tariff in respect of every shipment," so that "their duty and obligation grow out of and depend upon that act."  Id. at 202.  Thus, the Rice Court ostensibly implied that the ICA provided something comparable to an implied private cause of action for the plaintiff to bring suit.  On the other hand, the Court explained that it had jurisdiction because resolution of the plaintiff's claim "necessarily depended upon construction and effect of that act."  See id. at 203.  By making this statement, the Supreme Court implied that jurisdiction existed because the case rested on a disputed and

substantial federal issue because the arbitrating court would necessarily have to interpret the federal tariff to determine the amount due.

The Supreme Court was similarly vague about the type of federal question jurisdiction present in Thurston. In Thurston, the Court relied on its holding in Rice to conclude that it had federal question jurisdiction over the plaintiff's claim, in which the plaintiff sought to recover charges that the defendant allegedly failed to pay under a federal tariff, also filed under the ICA. See Thurston, 460 U.S. at 533–35. The Thurston Court explained that because the plaintiff's claim was predicated on provisions in the federal tariff, then the Court necessarily had federal question jurisdiction under 28 U.S.C. § 1337.[1] See id. at 535. As in Rice, in Thurston, the Supreme Court did not clarify whether federal question jurisdiction existed because the Court read an implied or express right of action into the ICA, or because the Court considered that the plaintiff's claim involved a substantial and disputed federal question because either (1) the arbitrating court would necessarily have had to interpret the federal tariff to determine the amount due; and/or (2) the parties disputed the interpretation of the controlling provisions of the tariff or disputed how those provisions applied to the facts of the case.

Thus, while the Supreme Court held in both Rice and Thurston that federal question jurisdiction existed, it remains unclear to this Court whether jurisdiction existed under the first or second portal of federal question jurisdiction.[2] Likely, the Supreme

---

[1]     Courts' analyses for "arising under" jurisdiction pursuant to 28 U.S.C. § 1337 and 28 U.S.C. § 1331 are analogous, if not identical. See Franchise Tax Bd., 463 U.S. at 8–9.
[2]     The Court similarly finds the basis for the Eighth Circuit's holding in MCI Telecommunications Corp. v. Garden State Investment Corp. unclear. See 981 F.2d 385

Court was not particularly clear on this issue because it was not until the Court decided

Franchise Tax Bd. in 1983 that the Supreme Court clarified its jurisprudence on the two

portals of federal question jurisdiction.  See 463 U.S. 1 (1983).

Because the Court finds that the basis for the Supreme Court's holding in both

Rice and Thurston is unclear, the Court is hesitant to find that federal question

jurisdiction exists in this case because the NGA creates an implied cause of action under

the first portal of federal question jurisdiction.[3]  Cf. Nw. Cent. Pipeline Corp., 576 F.

Supp. at 1502 n.10 (explaining that "[i]t is doubtful whether either the [Natural Gas

Policy Act] or [the Natural Gas Act] would provide [the] defendants with a federal claim

to litigate what is, in essence, a dispute over their sales contract with plaintiff").

---

(8th Cir. 1992).  In MCI, a telecommunications provider sued the defendant to recover unpaid service charges of amounts specified in a Federal Communications Commission ("FCC") tariff.  See id. at 386.  The plaintiff alleged that its action "ar[ose] under an act of Congress regulating commerce, [the FCA,] and thus, federal question jurisdiction exist[ed] under 28 U.S.C. § 1337(a)."  Id.

The MCI Court held that the lawsuit arose under federal law, pursuant to Rice and Thurston, because "the carrier's claim for payment [was] necessarily based on the filed tariff."  See id. at 387 (citing Thurston, 460 U.S. at 535).  The plaintiff in MCI alleged that § 203 of the FCA, 47 U.S.C. § 203 (1988), required it to collect the charges specified in the tariff.  See id. at 386.  Upon review, the Court finds that § 203 does not, in fact, explicitly provide the plaintiff with a federal cause of action.  See 47 U.S.C. § 203.  Rather, § 203 of the FCA prohibits carriers from charging, demanding, collecting, or recovering a greater or less or different compensation than the value specified in the tariff.  See id. § 203(c).  Thus, § 203 mirrors a similar provision in the ICA that the Supreme Court has held serves as a sufficient basis for finding federal question jurisdiction.  See Rice, 247 U.S. at 202; Thurston, 460 U.S. at 535.  Similar to the Supreme Court in Rice and Thurston, in MCI, the Eighth Circuit did not elaborate whether the plaintiff's claim was entitled to federal question because it was impliedly created by federal law, portal one, or necessarily relied on the resolution of a disputed federal question, portal two.  Because of this lack of clarity, the Court finds that the holding in MCI is also not particularly instructive.

[3]    As the Court explained in Part III(C)(1)(a), the NGA does not provide an express private right of action.

Moreover, an implied cause of action in a federal statute only exists if it meets all of the elements of the four-pronged test set out in <u>Cort v. Ash</u>, 422 U.S. 66 (1975).  <u>See also</u> <u>Virginia Bankshares, Inc. v. Sandberg</u>, 501 U.S. 1083, 1103 (1991).  Although a court must consider all four elements of the <u>Cort</u> test, the "central inquiry" is "whether Congress intended to create, either expressly or by implication, a private cause of action." <u>See</u> <u>Touche Ross & Co. v. Redington</u>, 442 U.S. 560, 575 (1979); <u>see also</u> <u>Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis</u>, 444 U.S. 11, 24 (1979).

In <u>City of Gainesville v. Florida Power & Light Co.</u>, a district court in Florida held that based on the four factor test articulated in <u>Cort</u>, the NGA does not provide a private cause of action.  <u>See</u> 488 F. Supp. 1258, 1278–79 (S.D. Fla. 1980) (explaining that "[n]othing in the legislative history of the Natural Gas Act indicates that Congress intended to grant any implied private rights of action therein.  On the contrary, the legislative history shows that Congress intended to establish a fairly common rate-making and regulatory scheme for interstate sales of natural gas. . ."); <u>see also</u> <u>Clark v. Gulf Oil Corp.</u>, 570 F.2d 1138, 1150 (3d Cir. 1977) (stating that "[i]t is not consistent with the underlying purpose of the regulatory scheme to imply a private remedy in damages for a breach of the [Natural Gas] Act.").

While the Court does not necessarily find the holding in <u>City of Gainesville</u> dispositive, the case is fairly persuasive.  Simply because the NGA requires transporters to charge reasonable rates and refrain from granting a preference or advantage to any of its shippers (<u>see</u> Pl.'s Mem. at 27–28 [Doc. No. 862]) does not suggest that Congress intended to create a cause of action.

26

Regardless, the Court finds that the lack of clarity stemming from <u>Rice</u> and

<u>Thurston</u> is ultimately immaterial because the Court holds below that it has federal

question jurisdiction over this case given the disputed and substantial federal issues at

play.  Accordingly, the Court declines to rule on whether the NGA creates an implied

cause of action or on whether federal question jurisdiction exists pursuant solely to the

<u>Rice</u>/<u>Thurston</u> "arising under" standard.

### 2.  Substantial Federal Question

In addition to arguing that Plaintiff's claims are not created by federal law, ESML

contends that Plaintiff failed to establish that the relief Great Lakes seeks necessarily

depends on the resolution of a substantial and disputed question of federal law.  (<u>See</u>

Def.'s Mem. at 10 [Doc. No. 858].)  Plaintiff disagrees.  Great Lakes argues that because

its Tariff is considered federal law, its claims necessarily rely on the construction and

application of federal law.  (<u>See</u> Pl.'s Mem. at 15, 19, 27 [Doc. No. 862].)

As a preliminary matter, the Court agrees with Plaintiff that federal tariffs carry

the same legal force as federal regulations, and are thus considered federal law.  <u>See</u>

<u>Central Iowa Power Co-op v. Midwest Indep. Transmission Sys. Operator, Inc.</u>, 561 F.3d

904, 913 (8th Cir. 2009); <u>MCI Telecomms. Corp. v. Garden State Inv. Corp.</u>, 981 F.2d

385, 387 (8th Cir. 1992) (explaining that "federal tariffs are the law, not mere contracts").

Although Plaintiff's claims are based on a contract that incorporates the Tariff, the

Court must ultimately determine if Plaintiff's "state-law claim[s] necessarily raise a

stated federal issue, actually disputed and substantial, which a federal forum may

entertain without disturbing any congressionally approved balance of federal and state

judicial responsibilities." <u>Grable</u>, 545 U.S. at 314. Federal question jurisdiction does not exist merely because a plaintiff's claim calls upon the application of federal law. <u>See, e.g.</u>, <u>RX.com, Inc. v. O'Quinn</u>, 766 F. Supp. 2d 790, 796 (S.D. Tex. 2011) (holding that federal question jurisdiction did not exist because the court would not be required to "determine the meaning of the Sherman Act," but instead would "merely need to apply [Sherman Act] . . . law to the facts of this case"). Great Lakes' state law claims must "implicate significant federal issues" in order for federal question jurisdiction to exist. <u>Grable</u>, 545 U.S. at 312. Specifically, "[t]he substantiality inquiry under <u>Grable</u> looks . . . to the importance of the issue to the federal system as a whole." <u>See</u> <u>Gunn v. Minton</u>, 133 S. Ct. 1059, 1066 (2013). "[I]t is not enough that the federal issue be significant to the particular parties in the immediate suit." <u>See</u> <u>id.</u> The Court proceeds by analyzing whether Plaintiff's claims in its First Amended Complaint satisfy this standard.

### a. Plaintiff's Count One

In Count One, Plaintiff alleges that ESML is liable for breaching and anticipatorily repudiating the Contract, which incorporates the Tariff. (<u>See</u> First Am. Compl. ¶ 48–54 [Doc. No. 35].) Great Lakes also alleges in Count One that ESML must pay "all sums due under the Contract as a result of breach, as well as all future sums due under the Contract as a result of the anticipatory repudiation." (<u>See</u> <u>id.</u> ¶ 53.) In order to determine whether Count One involves a substantial and disputed federal question, the Court must look to each element of Plaintiff's claim and determine whether ruling on Plaintiff's claim requires interpretation of one or more disputed Tariff provisions. <u>See</u> <u>Grable</u>, 545 U.S. at 314; <u>Williams</u>, 147 F.3d at 702.

### 1. Necessarily Raised and Actually Disputed Tariff Provisions

A case "arises under" federal law if the Court must determine a disputed and substantial federal question when addressing a "necessary element of one of the well-pleaded state claims." See Franchise Tax Bd., 463 U.S. at 13; Gunn, 133 S. Ct. at 1065 (explaining that federal jurisdiction over a state law claim only lies if the federal issue is "necessarily raised"); Humphrey v. Sequentia, Inc., 58 F.3d 1238, 1246 (8th Cir. 1995) (explaining that "'[t]o bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action'") (quoting Gully v. First Nat'l Bank, 299 U.S. 109, 112 (1936)).

Here, in Count One, Plaintiff explicitly sought damages as part of its breach of contract claim. (See First Am. Compl. ¶ 53 [Doc. No. 35].) According to the parties' TSA, "any controversy between the parties arising under th[e] Agreement . . . shall be determined in accordance with the laws of the State of Michigan." (See TSA § 13 [Doc. No. 80-2].) Therefore, Michigan law controls Plaintiff's breach of contract claim. Under Michigan law, "[a] party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in *damages to the party claiming breach*." Miller–Davis Co. v. Ahrens Const. Co., 495 Mich. 161, 178 (2014) (emphasis added); see also Bd. of Trustees of City of Pontiac Police & Fire Retiree Prefunded Grp. Health & Ins. Trust v. City of Pontiac, No. 316680, 2015 WL 1214714 (Mich. Ct. App. Mar. 17, 2015). Thus, damages were an

essential or "necessary" element of Plaintiff's Count One,  Gunn, 133 S. Ct. at 1065, and

the Court was required to construe and apply any and all Tariff provisions that affected

whether Plaintiff was entitled to collect damages for ESML's breach.  Specifically, the

Court had to determine whether the motivation underlying ESML's breach meant that

ESML was not required to pay damages under the Limitation of Liability clause, and

whether the factual events leading to ESML's breach meant that ESML was not obligated

to pay damages under the Force Majeure and Remedies clauses.

As noted above, the Contract incorporated the Tariff, and here, the Tariff included

a Limitation of Liability provision, which states that:

> Except as otherwise provided herein, neither Transporter nor Shipper *shall
> be liable in damages*, whether direct, indirect, consequential or otherwise,
> other than for acts of gross negligence, undue discrimination or willful
> misconduct and then only to the extent that Force Majeure does not apply,
> provided that nothing herein shall limit Transporter's or Shipper's liability,
> if any, for direct damages resulting from its own negligence.

(See Tariff § 6.13.8 (emphasis added) [Doc. No. 425-5].)  Therefore, in order to

adjudicate a "necessarily raised" element of Plaintiff's Count One, the Court must

interpret the applicability of the Limitation of Liability provision to the facts of

this case.

The Court must also interpret the applicability of two additional Tariff

provisions, the Force Majeure provision and the Remedies provision, to determine

whether ESML must pay the damages that Plaintiff alleges are due in Count One.

The Force Majeure provision of the Tariff provides that neither party is liable for

damages for any act "by or in consequence of" a specific set of events "whether of

the kind herein enumerated or otherwise."  (See Tariff § 10.1 [Doc. No. 80-2].)

Thus, in order to determine whether Great Lakes succeeded on the damages

element of its Count One, the Court needed to determine whether ESML's breach

in this case was caused by an event covered by the Force Majeure clause.

While the Force Majeure clause offered another potential basis for ESML

to limit its liability, the Force Majeure clause itself was limited by the Remedies

provision of the Tariff, which provides:

> Such causes or contingencies affecting the performance of the Agreement
> by either party, however, shall not relieve it of liability in the event of its
> concurring negligence . . . , *nor shall such causes or contingencies affecting
> the performance of this Agreement relieve either party from its obligation
> to make payments of amounts then due thereunder* . . .

(See Tariff ¶ 10.2 (emphasis added) [Doc. No. 80-2].)  Thus, in order to adjudicate

the merits of Plaintiff's Count One, the Court was required to analyze the

applicability of at least three Tariff provisions.

In this case, the parties "actually disput[e]" how the Court should interpret

all three of these provisions.  See Gunn, 133 S. Ct. at 1065 (explaining that federal

jurisdiction over a state law claim lies only if the federal issue is "actually

disputed"); Grable, 545 U.S. at 314 (requiring the federal issue to be "disputed and

substantial").

As to the Limitation of Liability provision, Defendant claims that the

provision prohibits Plaintiff from collecting damages on Defendant's breach.  (See

Def.'s Mem. Supp. Mot. for Summ. J. at 10 [Doc. No. 423].)  Specifically,

Defendant argues that by placing this language in the Tariff, Great Lakes limited

its recovery to the express rights and remedies set forth in the agreement and waived the right to pursue remedies under common law.  (See id.)  Plaintiff disagrees, and argues that "[i]f a shipper has no liability except for gross negligence, undue discrimination or willful misconduct, Great Lakes simply cannot enforce any of the other provisions of the Tariff.  Such a reading of the Tariff renders meaningless all other provisions which impose obligations on a shipper 'to pay.'"  (Pl.'s Opp'n Mem. at 25 [Doc. No. 429].)

As to the Force Majeure and Remedies provisions, Defendants claim that the 2008 financial crisis ("the Great Recession") qualified as an event covered by the Force Majeure clause, because the Great Recession prevented them from obtaining financing to commence construction of the facility, which ESML was required to construct pursuant to the Contract.  (See Defs.' Mem. in Opp'n to Pl.'s Mot. to Dismiss for Failure to State a Claim at 9–11, 22–27 [Doc. No. 374].)  ESML contends that the global financial meltdown, demand for steel, and credit freeze were "not of its own making," (see id. at 25), and therefore the Force Majeure clause applies, and Plaintiff failed to prove the damages element of its claim in Count One.

In contrast, Plaintiff argues that the "plain language of the Force Majeure clause is limited by the plain language of the Remedies clause which follows it." (See Pl.'s Reply Mem. at 14 [Doc. No. 384].)  Specifically, Great Lakes asserts that ESML's failure to secure funding for the facility because of the Great Recession was not an event covered by the Force Majeure clause because although the clause "includes a laundry list of hardships that may suspend a party's

32

obligations under the Contract, it does not include financial crises or changes in financial conditions." (See 5/15/12 Order at 18 [Doc. No. 397].) Thus, the parties "actually disput[e]" the proper interpretation and application of necessarily raised federal issues in this case. See Gunn, 133 S. Ct. at 1065.

Because this particular issue of subject matter jurisdiction was not raised until the eve of trial, the parties have already submitted briefing about the merits of Plaintiff's Count One and the Court has, in fact, already had the opportunity to evaluate the merits of Plaintiff's Count One in its May 15, 2012 Order and March 19, 2013 Order. (See generally 5/15/12 Order at 18 [Doc. No. 397]; 3/19/13 Order [Doc. No. 559].)

In its March 2013 Order, the Court directly addressed the parties' disagreement about the meaning and applicability of the Limitation of Liability and Remedies provisions. The Court explained that the Limitation of Liability provision must be construed "in the context of the entire Tariff." (See 3/19/13 Order at 18 [Doc. No. 559].) Accordingly, the Court explained that given the existence of the Remedies provision of the Tariff, the Limitation of Liability provision must only apply to select tort damages; otherwise, the Remedies provision would be "unnecessary." (See id. at 19, 22.) Accordingly, the Court held that, coupled with the Remedies clause, the Limitation of Liability provision did not excuse ESML from paying damages. (See id.)

When adjudicating the merits of Plaintiff's Count One, the Court also had to determine the meaning of the Force Majeure provision of the Tariff. In the May 2012 Order, the Court considered whether the Force Majeure clause excused ESML from paying damages, and thus whether Plaintiff adequately proved the damages element of its

Count One.  (See 5/15/12 Order at 12–19 [Doc. No. 397].)  Although the Force Majeure clause stated that liability for damages would not attach to breaches caused by events "whether of the kind herein enumerated or otherwise," (see Tariff § 10.1 [Doc. No. 80-2]), the parties disagreed about what events were captured by the term "otherwise." When determining which events were captured by the Tariff term "otherwise," the Court had to reconcile the Force Majeure provision with the Remedies provision of the Tariff. (See 5/15/12 Order at 18 [Doc. No. 397].)  Ultimately, the Court held that the Force Majeure clause did not excuse ESML from its obligation to pay damages for its breach. In sum, the Court's prior analysis of the merits of Count One further demonstrates that the federal issues in this case were both necessarily raised and actually disputed.

The Court finds that Plaintiff's case is similar to City of Chanute, Kansas v. Kansas Gas and Electric Co., No. 06-4096-JAR-JPO, 2007 WL 1041763 (D. Kan. Apr. 4, 2007).  In City of Chanute, the plaintiff sought "construction of a federally filed tariff[, which was filed pursuant to the Federal Power Act,] and a ruling that [the] defendants violated the terms of this tariff."  See 2007 WL1041763, at *6.  Therefore, the court was required to construct the terms of the federally filed tariff in order to determine the terms of the parties' agreement and whether the defendants were in violation of this agreement. Id. at *5.  The Kansas district court held that it had federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over the plaintiff's state law contract claim, because it was required to construct the terms of the tariff and determine whether the defendants' actions violated the terms of the agreement. See id. at *6.

Insofar as the <u>City of Chanute</u> Court's finding of jurisdiction was based on the fact that it had to construct substantial and disputed terms of the federal tariff, the Court finds the Kansas court's ruling persuasive.  <u>See id.</u> at *5.  Similar to the analysis completed in <u>City of Chanute</u>, here, the Court also had to interpret several provisions of the federal Tariff to determine whether Plaintiff is entitled to the damages it seeks in Count One. While the necessarily raised federal issue in <u>City of Chanute</u> was whether the defendants' conduct constituted a breach of the tariff, here, the necessarily raised federal issue was whether ESML was liable for damages.  Thus, in both cases, the adjudicating court was required to determine necessarily raised, substantial and disputed federal questions – the meaning of different tariff provisions.[4]

### 2. Necessarily Raised and Actually Disputed Issues of Federal Law Exist Without Addressing Defendants' Federal Defenses

The Court notes that, in its prior Orders, it considered the Limitation of Liability, Force Majeure, and Remedies Tariff clauses in the context of considering either the

---

[4]       While the Court agrees with the <u>City of Chanute</u> Court's end result and the main basis for its holding, the Court disagrees with some of the other bases for jurisdiction that the <u>City of Chanute</u> Court appears to espouse.  For instance, in <u>City of Chanute</u> the court seems to imply that it has jurisdiction simply because the FPA contains a provision which vests exclusive jurisdiction in federal courts for violations of the FPA or violations of regulations promulgated under the FPA.  <u>See id.</u> at *3.

Insofar as the court's ruling is based on this implication, the Court disagrees.  As the Court explained above, <u>see supra</u> Part III(C)(1)(a), a federal statute's "exclusive jurisdiction" provision is not a generator of jurisdiction.  Assuming that the statute does not provide a private cause of action for a plaintiff, if a plaintiff merely invokes that federal statute or a federal tariff promulgated under the statute, then a federal court does not necessarily have jurisdiction if the parties do not dispute a substantial question about the statute or the tariff.  Rather, federal courts only have exclusive jurisdiction over cases in which they otherwise already have original jurisdiction.

merits of Defendants' counterclaims or defenses.  (See 5/15/12 Order at 12–19 [Doc. No. 397]; Defs.' First Am. Answer ¶ 49 [Doc. No. 314].)  As the Court explained above, a federal defense does not provide a basis for removal, "even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue in the case."  See Caterpillar, 482 U.S. at 393 (citing Franchise Tax Bd., 463 U.S. at 12).  In fact, even a compulsory federal counterclaim does not establish "arising under" federal question jurisdiction.  See Vaden v. Discover Bank, 556 U.S. 49, 60–61 (2009) (citing Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc., 535 U.S. 826, 830 (2002)).

Here, however, the three Tariff provisions discussed above were not solely federal defenses.  Rather, had ESML not raised these defenses, the Court would have still had to consider and interpret these Tariff provisions when determining the merits of Plaintiff's affirmative case for damages in Count One.  Specifically, the Court would have had to determine whether ESML was excused from paying damages by any of the aforementioned Tariff provisions.

Construing the meaning of these three Tariff provisions was essential to determining whether Plaintiff was entitled to relief for Count One.  This is in stark contrast to other cases, in which courts have held that federal law was not an essential element of the plaintiffs' claims.  For instance, Plaintiff's case is distinguishable from Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667 (1950).  Although Skelly Oil involved actors, such as the respondent-natural gas company, that were subject to regulation under the NGA, the core of the dispute in the case was not based on a federal

tariff promulgated under the NGA.  See 399 U.S. at 669–70.  Rather, the contract underlying the respondent's breach of contract claim was a collateral contract between the respondent-natural gas company and the petitioner-petroleum supply company that did not incorporate a federally filed tariff.  See id.  The contract claim also did not require a federal court to construe any provision of the NGA or a federally filed tariff.  See id.  Therefore, it's unsurprising that the Supreme Court determined that federal question jurisdiction did not exist in the case.  See id. at 674.  The Skelly Oil Court clarified that even if the respondent had "sought damages from petitioners or specific performance of their contracts," federal question jurisdiction would not lie.  See id. at 672.  Federal question jurisdiction clearly would not lie in either of these instances, because neither seeking damages nor seeking specific performance would alter the fact that the underlying contract did not incorporate a federal tariff and the contract claim did not require the Court to construe any federal provision to determine the merits of the respondent's claim.

In contrast, here, even without directly considering Defendants' defenses, the Court would have had to construe disputed provisions of the Tariff in order to adjudicate the merits of Plaintiff's claim for damages in Count One.  Again, the Court reiterates that although Defendants raised federal defenses, the Court would have been required to interpret at least three Tariff provisions when determining an essential element of Plaintiff's Count One.  Cf. id. at 673 (explaining that federal court jurisdiction cannot arise "if a suit for a declaration of rights could be brought into the federal courts merely because an anticipated defense derived from federal law.")

Plaintiff's case is also distinguishable from Central Iowa Power Co-op. v. Midwest Independent Transmission System Operator, Inc., 561 F.3d 904 (8th Cir. 2009). In Central Iowa Power Co-op., the Eighth Circuit analyzed whether resolution of the appellant-plaintiff's state law claims necessarily implicated substantial and disputed federal issues. See 561 F.3d 904, 912 (8th Cir. 2009). The Eighth Circuit explained that the plaintiff's implied-contract and tort claims did not involve the federal tariff, because the appellee-defendants were not parties to the tariff, and thus were not bound by the provisions of the tariff.[5] Id. at 914. Accordingly, the court held that federal question jurisdiction did not exist because although the plaintiff's claims "implicate[d]" the tariffs, implication alone was not enough to give rise to federal question jurisdiction. Id. at 917. The parties in the case also failed to demonstrate that the state law claims challenged a provision in the tariff. Id. In contrast, here, Plaintiff and Defendants are both parties to the Tariff at issue, and are bound by its provisions. Moreover, resolution of Plaintiff's Count One not only implicated the Tariff, but depended on the Court's interpretation of the definition of terms and phrases within the Tariff.

---

[5]     The Court notes that in Central Iowa Power Co-op, the federal tariff at issue was not promulgated under the NGA. Rather, the tariff was promulgated pursuant to the Federal Power Act ("FPA"). See Central Iowa Power Co-op, 561 F.3d at 908. However, this difference between the cases is immaterial. "[T]he Supreme Court has held that the applicable case law for the two Acts is often interchangeable." Cal. ex rel. Lockyer v. Dynegy, Inc., 375 F.3d 831, 853 n.8 (9th Cir. 2004), opinion amended on denial of reh'g on other grounds, 387 F.3d 966 (9th Cir. 2004). For instance, in Arkansas Louisiana Gas Co. v. Hall, the Supreme Court explained that because "the relevant provisions of the [NGA and the FPA] are in all material respects substantially identical," the Court "follow[ed] [its] established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes." See 453 U.S. 571, 577 n.7 (1981) (internal quotations and citations omitted).

Finally, Plaintiff's case is also distinguishable from Pan American Petroleum

Corp. v. Superior Court of Delaware, 366 U.S. 656, 663 (1961).  In Pan American, a gas

pipeline company initially brought common law contract claims in state court seeking a

refund for overpayment made to defendant producers.  See 366 U.S. at 658.  Although

both parties were regulated under the NGA, the contract at issue did not implicate the

federal regulatory scheme as it was not the original FERC filed tariff, but was rather a

letter by the gas pipeline company stating that it would pay a higher rate, but would

expect a refund if it prevailed in its legal challenge to the validity of a state commission's

minimum rate order.  See id. at 659.  As another court explained, the "contract" at issue

in Pan American was, "in effect, an option contract based on a future litigation event."

Dynegy, 375 F.3d at 843.  The Supreme Court held that it lacked federal question

jurisdiction in Pan American because "[n]o right [was] asserted under the Natural Gas

Act," 366 U.S. at 663, and the Court was "not called upon to decide the extent to which

the Natural Gas Act reinforces or abrogates the private contract rights . . . in

controversy," id. at 664.

Unlike the state law option contract in Pan American, here, the Court is called

upon to decide the extent to which the Tariff, which is considered federal law, reinforces

or abrogates Plaintiff's right to recover damages.  Thus, here, the disputed provisions of

the Tariff raise actually disputed issues of federal law.

### 3.  Substantiality of Actually Disputed Federal Issues

As to the substantiality of the federal issues in this case, the Court finds that the

federal issues that the Court must decide are "significant to the federal system as a

whole," as opposed to only being "significant to the particular parties in the immediate suit." See Gunn, 133 S. Ct. at 1066.

In Grable, the Supreme Court explained that the meaning of the federal tax provision at issue was "substantial" because the Government had a strong interest in being able to recover delinquent taxes, not only in Grable, but in future cases as well. See 545 U.S. at 315.  In contrast, in Gunn, the Supreme Court held that the relevant federal issue "carrie[d] no such significance."  See 133 S. Ct. at 1067.  The Court explained that although the federal patent issue was actually disputed, the dispute was merely hypothetical as it would "not [have] change[d] the real-world result of the prior [underlying] federal patent litigation."  See id.

Here, the Court holds that its resolution of the actually disputed federal issues in this case – the interpretation and application of the Tariff provisions – is significant to the federal system as a whole.  See id. at 1066–67.  Likely, many tariffs contain liability limitation provisions that are similar, if not identical, to the provisions at issue in this case.  See, e.g., Hill v. MCI WorldCom Commc'ns, Inc., 141 F. Supp. 2d 1205, 1214 (S.D. Iowa 2001) (interpreting the limitation of liability provision in the controlling tariff, which stated that "[i]n no event shall [the defendant] be liable to customer for any indirect, special, incidental, consequential, exemplary or punitive loss or damage of any kind, including lost profits . . . by reason of any act or omission in its performance under this tariff"); In re Birch Telecom, Inc., No. 05-12237 (PJW), 2009 WL 1531792, *3 (Bankr. D. Del. June 2, 2009) (explaining that the relevant tariff in the cases provided that "The Company [Debtors] will not be liable for any direct, indirect, incidental,

special, consequential, exemplary or punitive damages to Customer or User [A–Tech] as a result of any Company *service,* equipment or facilities, or the acts or omissions or negligence of the Company, Company's employees or agents."); IPCO Safety Corp. v. WorldCom, Inc., 944 F. Supp. 352, 355 n.3 (D.N.J. 1996) (stating that the relevant tariff provides, in relevant part, that "LDDS shall not be liable for any direct, indirect, consequential, special, actual, or punitive damages, or for any lost profits of any kind or nature whatsoever arising out of any defects or any other cause.").

Therefore, in future NGA tariff violation cases, courts may look to the way in which this Court interpreted the Tariff provisions here, and applied those provisions to the particular facts of this case, in order to determine whether a defendant is liable for damages in a similar case. Accordingly, the way in which this Court constructs and applies that provision to the facts of this case may be instrumental in affecting how future courts interpret and apply similar provisions. In sum, the Court concludes that Plaintiff's Count One raises an "actually disputed and substantial" question of federal law. See Grable, 545 U.S. at 314.

### 4. Dispute of this Federal Issue Will Not Disrupt the Federal-State Balance

As the Court noted above, federal jurisdiction over a state law claim will only lie if the federal issues at play are "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." See Gunn, 133 S. Ct. at 1065. In Grable, the Supreme Court held that federal question jurisdiction existed because "the meaning of the federal [tax] statute [was] actually in dispute," and the federal issue was significantly

"substantial." See Grable, 545 U.S. at 315. Central to the Court's substantiality holding was that deciding the meaning of the federal tax provision at issue would not disrupt the federal-state balance. See id. at 319.

Here, like the parties in Grable, the parties dispute the meaning of provisions in the Tariff, and they contest the construction and effect of these Tariff provisions. Moreover, as in Grable, the Court's construction of the Tariff provisions also does not disrupt "Congress's intended division of labor between state and federal courts." See id. at 319. In this situation, Congress does not appear to have put out a "welcome mat meant [to] keep out." See id. In other words, the language of the NGA does not evidence Congress's intent to keep these types of cases out of federal court. Rather, the fact that the NGA includes section 717u, which provides federal courts "exclusive jurisdiction" over cases involving violations of regulations promulgated pursuant to the NGA, is evidence of the fact that Congress affirmatively sought to provide a federal forum for certain cases, such as this one.

### 5. The Court has Original and Exclusive Jurisdiction

Because this case involves substantial and disputed federal questions, the Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337, and has exclusive jurisdiction, pursuant to section 717u of the NGA. See 15 U.S.C. § 717u. As the Court discussed above, section 717u vests federal district courts with exclusive jurisdiction over cases that otherwise arise under federal law or involve a substantial question of federal law.

42

The Court notes that Plaintiff's case is distinguishable from Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804 (1986).  In Merrell Dow, the Supreme Court held that it lacked original jurisdiction because the plaintiffs' negligence claim, which was based in part on a theory that the defendant manufacturer violated the U.S. Food, Drug, and Cosmetic Act ("FDCA"), did not involve a substantial and disputed federal issue.  See 478 U.S. at 817.  The Court explained that because the FDCA did not contain a private cause of action for FDCA violations, it would "flout, or at least undermine, congressional intent to conclude that the federal courts might nevertheless exercise federal-question jurisdiction and provide remedies for violations of that federal statute."  See id. at 812.

In contrast, here, simply because the NGA does not provide an express or implied private right of action for Plaintiff does not mean that Congress intended to preclude a federal remedy for violations of the NGA.  Rather, the fact that the NGA includes section 717u, which provides federal courts with "exclusive jurisdiction" over cases involving violations of the NGA, is evidence of the fact that Congress affirmatively sought to provide a federal forum for cases, such as this one, that involve substantial and disputed federal issues.

The Court emphasizes, however, that jurisdiction in this case is *not* generated by 15 U.S.C. § 717u.  Rather, jurisdiction here lies under 28 U.S.C. § 1331 or § 1337.  The fact that section 717u grants exclusive jurisdiction to federal courts only means that federal courts have exclusive jurisdiction over cases that otherwise fall within the district

courts' original jurisdiction.  See Pan Am. Petroleum Corp., 366 U.S. at 664; Manning,

772 F.3d at 167 n.10.

In sum, here, the Court has original jurisdiction because Plaintiff's Count One

requires the Court to interpret three disputed provisions of a federal regulation – the

Tariff; and the Court has exclusive jurisdiction, pursuant to 15 U.S.C. § 717u, because

Plaintiff alleges a violation of a regulation, promulgated under the NGA.

### b.  Plaintiff's Counts Two, Three, and Four

As noted above, in Count Two, Plaintiff claims that "[u]nder the equitable

theories or remedies of piercing the corporate veil, alter ego and/or mere instrumentality,

the corporate structures of each of the Essar entities should be disregarded, and each of

the foreign Essar entities should be held liable for the damages recoverable by Great

Lakes as a result of [ESML's] breach of and anticipatory repudiation of the Contract."

(See First Am. Compl. ¶ 58 [Doc. No. 35].)  In Count Three, Plaintiff claims that "[a]s a

result of the Essar entities' joint enterprise or joint venture, each of the foreign Essar

entities should be held liable for the damages recoverable by Great Lakes as a result of

the breach and anticipatory repudiation of the Contract."  (See id. ¶ 61.)  And, finally, in

Count Four, Great Lakes alleges that because ESML was acting as the agent for the

foreign Essar entities, all of the foreign Essar entities should be held liable for the

damages suffered by Great Lakes.  (See id. ¶ 63.)

Plaintiff's Counts Two, Three, and Four are based solely on state common law

doctrines.  None of these claims require the Court to interpret any additional ambiguous

provisions of the Tariff.  Therefore, unlike Count One, the Court finds that Counts Two,

Three, and Four do not require additional analysis of an "actually disputed and substantial" federal question.  See Grable, 545 U.S. at 314.

### c. FERC's Refusal to Take the Case Doesn't Alter the Court's Ruling

ESML correctly notes that FERC dismissed ESML's complaint because the Commission determined that (1) it had no special expertise in "straight-forward contractual matters;" (2) there was no need for "uniformity of interpretation when dealing with a contract dispute over damages resulting from the termination of an agreement;" and (3) the issue of anticipatory repudiation of the TSA was not important in relation to the Commission's regulatory responsibilities.  (See Moen Decl., Ex. 4 "FERC Order Dismissing ESML's Complaint" at 6 [Doc. No. 859-1].)  FERC is given primary jurisdiction over disputes requiring its unique expertise or suits regarding the reasonableness of FERC-approved rates, pursuant to the "filed rate doctrine."  (See 3/19/13 Order at 14 [Doc. No. 559].)  Because ESML's complaint did not pertain to whether the rate between the parties was "just and reasonable," FERC correctly declined to hear the case.  (See id. at 14–16.)

However, simply because FERC does not have jurisdiction over this case because the filed rate doctrine does not apply does not mean that the contractual dispute in this case does not involve a substantial and disputed question of federal law.  While "Great Lakes is not challenging the rates in the Contract or Tariff, nor is it seeking to impose terms that are not found in these two documents" (Def.'s Mem. at 18 [Doc. No. 858]), the parties do dispute the meaning and application of relevant Tariff provisions.  Therefore,

in this case, Plaintiff's case is a "breach of contract lawsuit arising under state law," (see id. at 11; Moen Decl., Ex. 3 "Great Lakes' Answer to ESML's FERC Complaint" at 1, 9 [Doc. No. 859-1]), which also involves substantial and disputed questions of federal law.

### d. Distinguishing Non-Controlling Authority

Both parties cite non-controlling case law to bolster their arguments. Although the cases do not control the Court's holding, the Court discusses and distinguishes a handful of them below.

### 1. Cases Cited by Defendant

Defendant argues that this case is similar to (1) Monforte Exploration L.L.C. v. ANR Pipeline Co., No. H-09-3395, 2010 WL 143712 (S.D. Tex. Jan. 7, 2010); and (2) PJM Interconnection, LLC v. City Power Mktg., LLC, No. 1:12-cv-01779-RGA, 2013 WL 1498656 (D. Del. Apr. 12, 2013). The Court finds both cases distinguishable.

In Monforte, the parties, similar to the parties in this case, had entered into a contractual transportation agreement for the transportation and storage of natural gas. See 2010 WL 143712, *1. Pursuant to a FERC tariff, the defendant then issued an order that allegedly contradicted the substance of the private contractual agreement between the parties. Id. at *2. Accordingly, the plaintiff brought a state court action alleging that by issuing the order, the defendant breached the parties' contract. Id. The plaintiff's complaint did not invoke the tariff. Id. Only the defendant claimed that the tariff gave it the right to disregard the parties' contract. Id. at *4–*6. And since a federal defense, including a preemption defense, does not provide a basis for removal, see Caterpillar, 482

46

U.S. at 393, the court granted the plaintiff's motion to remand the case to state court.

Monforte, 2010 WL 143712, at *6.

Here, the link between the parties' contract and the FERC Tariff differs from the connection between the parties' contract and the FERC tariff in Monforte.  In Monforte, the question before the Court was essentially whether a FERC tariff preempted the distinct, private contract.  In contrast, here, the Court must analyze disputed provisions of the FERC Tariff, which are incorporated within the parties' contract, to determine the merits of Plaintiff's affirmative claims.  Therefore, Monforte is further afield than Defendant admits.

The Delaware District Court's decision in PJM Interconnection, LLC is also distinguishable.  In PJM Interconnection, LLC, the plaintiff, which ran an electronic transmission grid and operated under FERC, brought a breach of contract claim against defendants, which were members of the electricity market.  See 2013 WL 1498656, at *1.  Although the plaintiff initially filed the case in state court, the defendants removed the case to federal court.  See id.  The plaintiff then sought to remand the case back to state court, arguing that because its claim did not "implicate the tariff and challenge its terms," no federal question jurisdiction existed.  See id. at *2.  The Delaware district court held that federal question jurisdiction did not exist because the plaintiff's state law claims did not challenge FERC's tariff rates and did not challenge an earlier FERC decision ordering the defendants to repay the plaintiff.  See id. at *3.

Although the PJM Interconnection, LLC Court may have reached the proper result in remanding the case to state court – because perhaps the plaintiff's claims did not raise

substantial and disputed issues of federal law – its analysis of federal question jurisdiction was nonetheless flawed.  As Plaintiff explains, the district court "erroneously implied that in order to confer federal question jurisdiction, the complaint must 'challenge the tariff rates themselves.'" (See Pl.'s Mem. at 8 n.7 (citing PJM Interconnection, LLC, 2013 WL 1498656, at *2) [Doc. No. 862].)  In fact, had the plaintiff challenged the reasonableness of the tariff rates, then the federal court should have denied hearing the case because FERC has primary jurisdiction over cases involving the reasonableness of rates.  See Ark. La. Gas Co. v. Hall, 453 U.S. 571, 578 (1981); Board of Public Works, City of Blue Earth, Minn. V. Wis. Power and Light Co., 613 F. Supp. 2d 1122, 1130 (D. Minn. 2009).

Here, although Plaintiff's claim for damages in Count One rests on the underlying state law breach of contract claim, the damages element of the claim requires analysis and interpretation of disputed provisions of the Tariff.  Therefore, unlike the plaintiff's contract claim in PJM Interconnection, LLC, the Court properly has federal question jurisdiction in this case.  Therefore, both Monforte and PJM Interconnection, LLC, are inapposite to the case before the Court.

## 2.  Cases Cited by Plaintiff

Similar to Defendant, Plaintiff also cites inapplicable precedent from outside the Eighth Circuit.  It argues that the circumstances here are similar to those in (1) Pacificorp v. Northwest Pipeline GP, No. CV. 10-99-PK, 2010 WL 3199950 (D. Or. June 23, 2010), report and recommendation adopted, 2010 WL 3219533 (D. Or. Aug. 9, 2010); and (2) T

& E Pastornio Nursery v. Duke Energy Trading and Marketing, LLC, 268 F. Supp. 2d
1240 (S.D. Cal. 2003).

In Pacificorp, the Oregon district court held that federal question jurisdiction
existed because the plaintiff sought to enforce obligations that fell squarely within the
exclusive jurisdiction provision of the NGA.  See 2010 WL 3199950, at *6.  However,
the court explained that it was "reluctant to reach this conclusion in light of the Supreme
Court's statement in Pan American that the Natural Gas Act's exclusive jurisdiction
provision is not a 'generator of jurisdiction.'"  See id. at *6 n.3.  (citing Pan Am., 366
U.S. at 664).  Nonetheless, the Pacificorp Court felt bound to reach to its holding because
of Ninth Circuit precedent, specifically, Sparta Surgical Corp. v. Nat'l Ass'n of Sec.
Dealers, Inc., 159 F.3d 1209 (9th Cir. 1998), and Cal. ex. rel. Lockyer v. Dynegy, Inc.,
375 F.3d 831 (9th Cir. 2004), in which the Ninth Circuit held that "'the rule that state law
claims cannot be alchemized into federal causes of action by incidental reference has no
application when relief is partially predicated on a subject matter committed exclusively
to federal jurisdiction.'"  See Pacificorp, 2010 WL 3199950, at *6 n.3 (quoting Dynegy,
Inc., 375 F.3d at 843 n.10).  The Pacificorp Court explained that Sparta and Dynegy
make clear that federal question jurisdiction exists "where a party [simply] invokes
jurisdiction under a federal statute that vests exclusive jurisdiction in the federal courts."
See id. at *5.

The Supreme Court expressly stated in Pan American that the NGA's exclusive
jurisdiction provision is not a "generator of jurisdiction."  See Pan Am., 366 U.S. at 664.
Thus, simply because a plaintiff has a state law claim that "incidentally references" or

"invokes" a federal statute that vests exclusive jurisdiction in federal courts, does not suggest that a court has *de facto* federal question jurisdiction. As the Court explained above, Pan American counsels the Court to conclude that the NGA's exclusive jurisdiction provision does not create jurisdiction in this case. See supra Part III(C)(1)(a). Rather, federal question jurisdiction exists here because Plaintiff's claim for damages requires the Court to interpret substantial and disputed provisions of the federal Tariff. Accordingly, insofar as Pacificorp's ruling is based on the fact that simple invocation of a statute that vests exclusive jurisdiction in federal courts is sufficient to find federal question jurisdiction, the Court disagrees, and finds Pacificorp distinguishable.[6]

T & E Pastornio Nursery is similarly distinguishable. In T & E Pastornio Nursery, the plaintiffs' state law contract claims stemmed from the defendants' alleged breach of their obligations under a federal tariff. See 268 F. Supp. 2d at 1247. The California district court held that because the FPA vested the federal courts with "exclusive jurisdiction" for violations of regulations promulgated under the FPA, the court necessarily had jurisdiction over the plaintiffs' claims. See id. As in Pacificorp, the T & E Pastornio Nursery Court's analysis was based on the Ninth Circuit's holding in Sparta Surgical. See id. (citing Sparta Surgical, 159 F.3d at 1212). The court explained that

---

[6]     The Court notes that reading Pacificorp as a whole, it appears that the Oregon court's ruling was based primarily on the fact that a mere invocation of the NGA's exclusive jurisdiction provision was sufficient to find jurisdiction. However, the Pacificorp Court also noted that it had federal question jurisdiction because the plaintiff's contract and negligence causes of action "turn[ed] on the meaning of provisions in the FERC-filed tariff." See 2010 WL 3199950, at *6. Insofar as this disputed federal issue formed the true basis of the court's holding, the Court finds the Pacificorp Court's ruling persuasive.

jurisdiction existed not under 28 U.S.C. § 1331, but under 16 U.S.C. § 825p – the exclusive jurisdiction provision of the FPA.  See id. at n.5.

The Court finds T & E Pastornio Nursery unpersuasive for the same reasons that Pacificorp was unpersuasive.  Just as the exclusive jurisdiction provision of the NGA is not a "generator of jurisdiction," Pan Am., 366 U.S. at 664, the exclusive jurisdiction provision of the FPA is similarly not a generator of jurisdiction.  Therefore, insofar as T & E Pastornio Nursery's ruling is based on the fact that simple invocation of a statute that vests exclusive jurisdiction in federal courts is sufficient to find federal question jurisdiction, the Court disagrees.

## IV.   MOTION TO AMEND

In Plaintiff's Motion for Leave to File Second Amended Complaint, Great Lakes seeks to add sections to its Complaint, alleging that, in addition to diversity jurisdiction, this Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 717u.  (See Ellison Aff., Ex. 2, "Plaintiff's Proposed Second Amended Complaint" ¶ 10 [Doc. No. 815-2].)  Great Lakes argues that federal question jurisdiction exists here based on federal defenses raised by Defendants, such as ESML's argument that it was excused from performance by the Force Majeure clause.  (See id. ¶ 54.)  In response, Defendants argue that Plaintiff should not be permitted to amend its Complaint because (1) Plaintiff cannot show good cause under Fed. R. Civ. P. 16(b); (2) amendment would be futile; (3) amendment would cause Defendants undue prejudice; (4) Plaintiff has acted with undue delay and bad faith; and (5) amendment is not permissible under 28 U.S.C. § 1653.  (See Defs.' Mem. in Opp'n at 14–30 [Doc. No. 823].)

"Although leave to amend typically is granted liberally under Federal Rule of Civil Procedure 15, different considerations apply when a party seeks amendment beyond the deadline set in a scheduling order." Weber v. Travelers Home & Marine Ins. Co., 801 F. Supp. 2d 819, 830 (D. Minn. 2011) (citing Morrison Enters., LLC v. Dravo Corp., 638 F.3d 594, 610 (8th Cir. 2011) (explaining that "[w]hen a party moves for leave to amend outside the district court's scheduling order, Fed. R. Civ. P. 16(b), not the more liberal standard of [Rule 15], governs."). Pursuant to Rule 16(b) of the Federal Rules of Civil Procedure, a "schedule may be modified only for good cause and with the judge's consent." See Fed. R. Civ. P. 16(b)(4). "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements." Bradford v. DANA Corp., 249 F.3d 807, 809 (8th Cir. 2001) (citing Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992)). Only if the Court determines that the moving party demonstrates good cause may the Court then proceed to evaluate other factors such as "'[t]he existence or degree of prejudice to the party opposing the modification.'" Bradford, 249 F.3d at 809 (quoting Johnson, 975 F.2d at 609).

In this case, the magistrate judge, who was originally assigned to this case, permitted Plaintiff to amend its Complaint once before Defendants served a responsive pleading. (See 1/14/10 MJ Order at 2 [Doc. No. 20].) Although this court order was not in the form of a formal scheduling order, it served the same purpose as a deadline set in a scheduling order. Therefore, further amendment of the Complaint was subject to the standards set in Rule 16. See Weber, 801 F. Supp. 2d at 830.

Here, Plaintiff fails to establish good cause for its tardy motion seeking to amend its complaint because it has not shown that it was diligent in attempting to meet the magistrate judge's scheduling order.  See Bradford, 249 F.3d at 809.  Great Lakes claims that although it only alleged diversity jurisdiction in its First Amended Complaint, "federal question jurisdiction has been present in the case since [October 2009]," when this action was commenced.  (See Pl.'s Mem. at 2 [Doc. No. 814].)  Assuming Plaintiff correctly states that federal question jurisdiction has always been present in this case, Plaintiff was not diligent in seeking amendment.[7]  See, e.g., Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 717 (8th Cir. 2008) (reversing the district court's finding of good cause because the defendant admitted that in May 2006 it was aware of the affirmative defense it sought to add to its answer, but the defendant failed to seek amendment until January 2007); Barstad v. Murray County, 420 F.3d 880, 883 (8th Cir. 2005) (affirming the district court's finding that the plaintiffs failed to establish good cause to amend their complaint because the plaintiffs "knew of the claims they sought to add when they filed the original complaint"); Freeman v. Busch, 349 F.3d 582, 589 (8th Cir. 2003) (affirming the district court's finding that the plaintiff failed to establish good cause to amend her complaint because there was "no reason why punitive damages could not have earlier been alleged").

---

[7]    Although Defendants earlier stipulated that they would not object to the Court's exercise of subject matter jurisdiction (see Stipulation at 2–3 [Doc. No. 392]), such a stipulation is an insufficient basis for the Court to find good cause.  Pursuant to Fed. R. Civ. P. 8(a)(1), a plaintiff's complaint must include "a short and plain statement of the grounds for the court's jurisdiction."  See Fed. R. Civ. P. 8(a)(1).  A stipulation, which is a separate document from the controlling complaint in a case, does not satisfy the jurisdictional statement required by Rule 8(a)(1).

Moreover, the proposed amendments that Plaintiff seeks to make to its Complaint are futile.  The amendments do not directly address and lay out the manner in which the Court must interpret the substantial and disputed federal questions at issue in this case. Rather, Great Lakes appears to argue that federal question jurisdiction exists either simply because its Contract invokes federal law, or because evaluating Defendants' defenses requires interpretation of federal law.  (See Proposed Second Am. Compl. ¶¶ 10, 54 [Doc. No. 815-2].)  As the Court explained above, these are not bases for federal question jurisdiction to lie.  Rather, federal question jurisdiction exists in this case because the Court must interpret at least three disputed Tariff provisions when analyzing Plaintiff's affirmative claim for damages in Count One.  Therefore, Great Lakes' proposed amendments in this case would be futile.  Accordingly, Plaintiff's Motion for Leave to File Second Amended Complaint is denied.

The Court notes, however, that simply because it denies Plaintiff's motion does not alter the Court's ruling on Defendant's Motion to Dismiss for Lack of Jurisdiction. The Court may still find subject matter jurisdiction, even if a complaint fails to explicitly allege the proper basis for jurisdiction.  See Jones v. Freeman, 400 F.2d 383, 387 (8th Cir. 1968).  Because this Court prefers substance over form, it finds that federal question jurisdiction exists in this case even without Plaintiff's amendment.

## V.    MOTIONS IN LIMINE

Plaintiff's Motion in Limine was filed on October 9, 2014 [Doc. No. 835], and Defendant's Motion in Limine was filed soon after on October 14, 2014 [Doc. No. 842]. The underlying issues in this case have evolved since both motions were filed.  Given the

Court's most recent rulings and the fact that several months have passed since the parties were initially preparing for trial, the Court finds that it is appropriate to deny both motions without prejudice.  The Court will be in a better position to decide motions in limine when they are filed anew.  When the Court issues a new trial date, the Court will set a new motion in limine schedule.  Based on the forthcoming schedule, the parties will be welcome to either re-file their motions or file new motions.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Defendant Essar Steel Minnesota LLC's Motion to Dismiss for Lack of Subject Matter Jurisdiction [Doc. No. 856] is **DENIED**.

2. Plaintiff's Motion for Leave to File Second Amended Complaint [Doc. No. 812] is **DENIED**.

3. Plaintiff's Motion in Limine [Doc. No. 835] is **DENIED, without prejudice**.

4. Defendant's Motion in Limine [Doc. No. 842] is **DENIED, without prejudice**.

5. The parties will participate in a telephonic status conference on Wednesday, May 13, 2015 at 3:30 pm CST.  The Court will separately provide call-in information to the parties.

Dated:  May 4, 2015                          s/Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge